IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNILIFE CORPORATION, *et al.*,[1] | ) | Case No. 17-10805  (LSS) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING
RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE ASSET
PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE SUCCESSFUL
BIDDER, AND (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF**

Unilife Corporation (a Delaware corporation) ("Unilife" or the "Company"), Unilife

Medical Solutions, Inc. (a Delaware corporation) ("UMSI"), Unilife Cross Farm, LLC (a

Delaware limited liability company) ("Cross Farm") (collectively, the "Debtors") hereby move

this Court (this "Motion") and respectfully state as follows:

**Background**

1.      On the date hereof (the "Petition Date"), the Debtors each filed voluntary petitions

for relief under Chapter 11 of the Bankruptcy Code in this Bankruptcy Court (the "Chapter 11

Cases"). On the Petition Date, the Debtors moved for an order of joint administration pursuant to

---

[1]  The Debtors in these chapter 11 cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): Unilife Corporation (9354), Unilife Medical Solutions, Inc. (9944), and Unilife Cross Farm LLC (3994).  The Debtors' corporate headquarters and the mailing address for each Debtor is 250 Cross Farm Lane, York, PA 17406.

Bankruptcy Rule 1015(b).  The Debtors remain in possession of their property and continue in the operation and management of their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2.      The Debtors have two non-debtor affiliates that are organized under Australian law, Unitract Syringe Pty Limited ("Unitract"), and Unilife Medical Solutions Limited ("UMSL"). UMSL is a holding company that owns the equity of Unitract and UMSI.  UMSL is wholly owned by Unilife.  Unitract is the entity that owns substantially all of the Debtors' intellectual property. Unitract and UMSL are not debtors in these proceedings.  Neither Unitract nor UMSL have any employees or business operations.

3.      Unilife was incorporated in Delaware on July 2, 2009, as a wholly-owned subsidiary of UMSL.  On January 27, 2010, Unilife became the parent company of UMSL upon completion of the redomiciliation under Australian law and UMSL's stockholders and option holders exchanged their interests in UMSL for equivalent interests in Unilife.  On February 16, 2010, Unilife's common stock began trading on the Global Market of The NASDAQ Stock Market LLC under the symbol "UNIS."  Unilife's shares of common stock also trade in the form of Chess Depositary Interests ("CDIs") on the ASX under the symbol "UNS" (since January 18, 2010). Prior to January 18, 2010, the ordinary shares of UMSL were traded on the ASX under the symbol "UNI".

4.      Unilife and its subsidiary Debtors design, manufacture and supply innovative injectable drug delivery systems that can enhance and differentiate the injectable therapies of its pharmaceutical and biotechnology customers.  An injectable drug delivery system is a product that forms a part of a drug-device combination product that is utilized by a pharmaceutical or

biotechnology company to facilitate the administration of a dose of an injectable therapy by patients or healthcare providers.

5.      The Debtors have a broad portfolio of proprietary product platforms but currently focus their business on their wearable injector products.  The majority of the Debtors' products are designed for sale directly to pharmaceutical and biotechnology companies who are expected to supply them as drug-device combination products, pre-filled and ready for administration by end-users, such as patients or health-care providers.

6.      The Debtors' wearable injector portfolio is designed to support growing pharmaceutical demand for disposable drug delivery systems that can be worn on the body of a patient over pre-configured periods such as several minutes or several hours during the subcutaneous injection of a measured dose of an injectable therapy.  All of the Debtors' wearable injector products are designed to allow pharmaceutical and biotechnology companies to supply their therapies to end users in a pre-filled, pre-assembled and ready-to inject format for simple and convenient self-injection to minimize disruption to normal daily life during the period of therapy administration.

7.      Notwithstanding the strength of the current management team and the potential of the Debtors' innovative product lines, the Debtors' business is still not mature enough to generate the cash necessary to finance the Debtors' operations and has consumed substantial amounts of cash to date.  Currently, the Debtors project a continuing cash burn and loss on operations through the end of 2017.

8.      The Debtors have commenced these cases to implement a process to market and sell the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Debtors have concluded, in the exercise of their business judgment, and as fiduciaries for all of the Debtors'

stakeholders, that the best and only viable path to maximize the value of their business and to preserve jobs is to sell their business in connection with a 363 sale process. Accordingly, the Debtors have filed a motion seeking Court approval to sell their businesses pursuant to 11 U.S.C. § 363 (a "363 Sale"), over a three month timeframe, in order to maximize and preserve value for the Debtors' estates.

9.      Further information regarding the Debtors' business, background, capital structure financial results and the events leading up to their bankruptcy filings can be found in the *Declaration of John Ryan in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "Ryan Declaration"), which is incorporated herein by reference.

## Relief Requested

10.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"): (a) authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 in connection with the sale of substantially all of the Debtors' assets (the "Assets"); (b) approving the form and manner of notice attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice") of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"); (c) scheduling the Auction and Sale Hearing; (d) approving procedures for the assumption and assignment (as set forth in the Bidding Procedures Order, the "Assumption Procedures") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Contracts"); and (e) granting related relief.

11.     The Debtors and their professionals have already undertaken and will continue to market the Assets prior to the Auction, in the manner set forth in the Bidding Procedures Order.

LEGAL\29965280\6

During this marketing process, the Debtors reserve the right to enter into a "stalking horse" agreement (the "Stalking Horse Agreement") with a bidder if the Debtors believe that such an agreement will further the purposes of the Auction by, among other things, enticing value-maximizing bids. The Debtors and their professionals are currently engaged in attempting to identify a stalking horse bidder and those efforts shall continue. Accordingly, the Debtors request authority, in the exercise of their reasonable business judgment, to offer a Stalking Horse bidder (the "Stalking Horse Bidder") any or all of the following as part of a Stalking Horse Agreement: (a) a break-up fee (the "Break-Up Fee") in an amount to be determined by the Debtors, not to exceed 3 percent of the total purchase price offered by the Stalking Horse Bidder in the Stalking Horse Agreement; (b) reimbursement of the Stalking Horse Bidder's reasonable and actual fees and expenses incurred as the Stalking Horse Bidder up to $250,000 (the "Expense Reimbursement"); (c) initial overbid protection in the amount of $100,000 plus the amount of the Break-Up Fee and Expense Reimbursement (the "Initial Overbid" and, together with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections").[2]

12.     The Debtors also request that, to the extent the Debtors enter into a Stalking Horse Agreement, any Break-Up Fee and/or Expense Reimbursement be granted administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

13.     Furthermore, the Debtors will seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as Exhibit B (the "Sale Order"): (a) authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid; (b) authorizing and

---

[2]   The Debtors shall consult with ROS (defined below) in determining whether to select a Stalking Horse Bidder and the level of Bid Protections to be offered to such a bidder, consistent with the provisions of the DIP Facility (as defined below). The terms of the Bidding Procedures Order and the Sale Order are subject to the approval of ROS and may change.

approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests, all in accordance with the Successful Bid; (c) authorizing the assumption and assignment of the Contracts; and granting any related relief.

14.     The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

### Jurisdiction and Venue

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

16.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by this Court in connection with this Motion, to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1408.

18.     The bases for the relief requested in this Motion are sections 105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006(a), and Local Rules 2002-1, 6004-1, and 9013-1(m).

## The Debtors' Sale Efforts

19.     As set forth in the Ryan Declaration,[3] the Debtors' business does not generate the cash necessary to finance their operations and has consumed substantial amounts of cash to date. The Debtors have incurred net losses during fiscal years[4] 2016, 2015, 2014 and 2013 of approximately $100.8 million, $90.8 million, $57.9 million and $63.2 million, respectively.  The Debtors continued to consume cash during the beginning of fiscal year 2017 and project a continuing cash burn and loss on operations through at least the end of fiscal year 2017.

20.     Although the Debtors achieved some cost reductions by, among other things, headcount reductions and the subleasing of a portion of the King of Prussia facility (as described in the Ryan Declaration), the Debtors' business is not mature enough to generate sufficient revenues to cover its operating expenses without significant inflows from financing activities.

21.     In August 2016, the Company engaged SSG Capital Advisors, LLC ("SSG") to assist with continuing fundraising efforts.  SSG contacted dozens of potential lenders and investors over a several month period.  SSG's efforts resulted in just one serious expression of interest. Substantial and extensive discussions ensued by and among the Company, ROS, Amgen, and a large multi-asset alternative investment firm toward a transaction that would have resulted in an infusion of necessary capital into the Company.  The transaction that was discussed would have resulted in a substantial capital infusion into the Company and a restructuring of the Amgen and ROS debt and the Debtors' balance sheet.  Further, the transaction presented an opportunity to permit the Debtors to continue their business operations possibly without the need for Chapter 11 relief.

---

[3]   Capitalized terms not defined herein shall have the meanings ascribed to them in the First-Day Declaration.
[4]   The Debtors operate on a fiscal year ending June 30.

LEGAL\29965280\6

22.     Despite the Company's diligent efforts, these discussions broke down in late March 2017, due to the Company's inability to obtain the necessary bridge financing over the period required by the potential investor to complete its due diligence.

23.     As a result, the Debtors, after consultation with their advisors and other professionals, and after due deliberation, determined that the best course of action under the circumstances would be to file a chapter 11 petition and to seek approval of a 363 Sale in order to preserve the value of their business.  In connection with that decision, the Debtors negotiated a debtor-in-financing package with their secured term lender, ROS Acquisition Offshore LP ("ROS").  The proposed DIP package, if approved, will fund the Debtors' operations for approximately 90 days during which time the Debtors will seek to sell their business as a going concern in a 363 Sale.  The funding will enable the Debtors to conduct a robust marketing process so that the value of their estates will be maximized.

24.     Simultaneously herewith, the Debtors are filing a motion seeking entry of an order (the "Interim DIP Order") approving the postpetition financing package (the "DIP Facility") offered by ROS.  The DIP Facility requires that (a) a motion for authority to sell substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code be filed, (b) the Court enter an order approving bidding procedures in form and substance acceptable to ROS by May 15, 2017; (c) an auction for the sale of the Debtors' assets be commenced by no later than June 9, 2017 pursuant to the bidding procedures order; and (d) the entry of an order approving the sale of the Debtors' assets in form and substance acceptable to ROS by June 16, 2017.  In addition, the DIP Facility provides that ROS shall have the right to credit bid for the Debtors' assets and that the proceeds of any sale be paid at the closing of such sale to ROS to satisfy or reduce the Debtors' pre- and post-petition obligations to ROS.

25.    As part of the proposed sale process, the Debtors, SSG, and the Debtors' other advisors will engage in a robust marketing effort for the Debtors' assets, contacting both financial and strategic investors regarding a potential sale process.

26.    SSG will place no conditions on potentially interested parties regarding bid levels, structure, or management in connection with the solicitation of indications of interest. All interested parties will be given an opportunity to execute a confidentiality agreement. Those parties that execute a confidentially agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and/or their advisors, and access to financial, operational, and other detailed information in a data room.

### The Proposed Sale

27.    The Debtors believe a prompt sale of the Assets represents the best option available for all stakeholders in these chapter 11 cases. Moreover, it is critical for the Debtors to execute on a sale transaction within the timeframe contemplated by the Debtors' agreements with ROS as embodied in the proposed debtor-in-possession financing order (the "DIP Order"), as the funding offered by ROS is limited.

28.    By this Motion, the Debtors request that the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this Motion, as it pertains to the bidding procedures, at a hearing to take place approximately twenty-one (21) days following the Petition Date. These dates are subject to change in the event that the Bankruptcy Court is not available to conduct a hearing on that date or does not enter an order at or immediately following that hearing:

a.    ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract will be filed and served no later than 4:00 p.m.

(prevailing Eastern Time) on the day that is fourteen (14) calendar days after the service of the Cure and Possible Assumption and Assignment Notice (as defined below).

b.   *Bid Deadline*: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, if one has been accepted by the Debtors as contemplated by the Bidding Procedures Order, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) must be received by no later than June 8, 2017 at 10:00 a.m. (prevailing Eastern Time) (the "Bid Deadline").

c.   *Auction*: The Auction, if necessary, will be held at the offices of Cozen O'Connor, 1201 North Market Street, Suite 1001 Wilmington, Delaware 19801 on June 9, 2017 at 10:00 a.m. (prevailing Eastern Time), or such other location as identified by the Debtors after notice to all Qualified Bidders.

d.   *Sale Objection Deadline*: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on June 5, 2017.

e.   *Sale Hearing*: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before June 13, 2017 at 10:00 a.m. (prevailing Eastern Time).

29.    The Debtors believe that this timeline maximizes the prospect of receiving fair value for the Assets without unduly prejudicing these chapter 11 estates. To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following entry of the Bidding Procedures Order to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

## The Bidding Procedures Order

## I.    The Bidding Procedures

30.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order. The Bidding Procedures were developed to permit

LEGAL\29965280\6

an expedited sale process, to promote participation and active bidding, and to ensure that the Debtors receive the highest or otherwise best offer for the Assets. The Debtors believe that the timeline for consummating the sale process established pursuant to the Bidding Procedures is in the best interest of their estates and all parties in interest and is achievable under the deadlines set under the DIP Facility.

31.    The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder, and the ability of the Debtors to select a Stalking Horse Bidder and to award certain Bid Protections if the Debtors believe, in the exercise of their business judgment, that selecting a Stalking Horse Bidder and awarding Bid Protections will enhance the Debtors' efforts to maximize the value of the Assets.

32.    The following summary describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1.[5]

    a. **Qualification of Bidders (Local Bankr. R. 6004-1(c)(i)(A)).** To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtors to satisfy each of the following conditions:

        i. **Corporate Authority.** Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the Sale; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Bidder must furnish written evidence reasonably acceptable to the

---

[5] This summary of the Bidding Procedures is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern. The Bidding Procedures are also subject to the review and comment of ROS as provided under the DIP Term Sheet.

Debtors of the approval of the Sale by the equity holder(s) of such Bidder. *See* Bidding Procedures § III(C)(3).

ii. **Proof of Financial Ability to Perform.** Written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Sale and provide adequate assurance of future performance under all Assigned Contracts. Such information should include, inter alia, the following:

   • contact names, email addresses and telephone numbers for verification of financing sources;

   • evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Sale;

   • the Bidder's current financial statements (audited if they exist); and

   • any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Sale; provided, however, that the Debtors shall determine, in their sole discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

   *See* Bidding Procedures § III(C)(4).

b. **Qualified Bids (Local Bankr. R. 6004-1(c)(i)(B)).** Each Bid must be determined by the Debtors to satisfy each of the following conditions:

   iii. **Good Faith Deposit.** Each Bid must be accompanied by a deposit paid in cash or by wire transfer in immediately available funds, into a non-interest bearing escrow account to be identified and established by the Debtors in an amount equal to ten percent (10%) of the proposed purchase price, (the "Good Faith Deposit"). *See* Bidding Procedures § III(C)(1).

   iv. **Terms.** A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Sale (the "Transaction Documents"). A Bid should propose a Sale involving substantially all of the Debtors' Assets. The Debtors reserve the right to submit a form asset purchase agreement which Bidders can utilize to formulate their Bids but shall not be required to submit such a document. The Debtors shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtors' estates as a whole. The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it (collectively, the "Assigned Contracts"). The Debtors will consider proposals for less than substantially all of the Debtors' assets or operations. A bid to purchase

only certain assets of the Debtors shall include a purchase price determined by such Bidder but shall be reviewed by the Debtors to evaluate the sufficiency of the purchase price. *See* Bidding Procedures § III(C)(2).

    v.   **Contingencies.** A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties. *See* Bidding Procedures § III(C)(5).

    vi.   **Irrevocable.** A Bid must be irrevocable until the closing of the Auction; provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined in the Bidding Procedures), such bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures. *See* Bidding Procedures § III(C)(6).

    vii.   **Disclaimer of Fees.** Each Bid (other than a Stalking Horse Bid, if any) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, except as the Debtors may agree with a Stalking Horse Bidder pursuant to the Bidding Procedures Order. By submitting its Bid, each Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including pursuant to section 503(b) of the Bankruptcy Code. *See* Bidding Procedures § III(C)(7).

    viii.   **Bid Deadline.** The Debtors must receive a Bid in writing, on or before the Bid Deadline, June 8, 2017 at 10:00 a.m. (prevailing Eastern Time) or such later date as may be agreed to in writing by the Debtors. *See* Bidding Procedures § III(C)(8).

c.  **Right to Credit Bid (Local Bankr. R. 6004-1(b)(iv)(N)).** ROS and Amgen, Inc. are each deemed to be a Qualified Bidder and are not required to make any Good Faith Deposit. ROS and Amgen may participate in the Auction and credit bid at any time up to the conclusion of the Auction, in their respective sole and absolute discretion, any portion and up to the entire amount of its claims, including, without limitation, both its prepetition claims and all obligations under the DIP Order and the DIP Loan Documents (as defined in the DIP Order), at any time, on any individual Asset or portion of the Assets (the "Credit Bid"). Upon exercise of a Credit Bid, Amgen and ROS shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, against which it holds

13

a first priority lien and security interest, but shall each have the right to designate any person or entity in their respective sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid. Holders of Permitted Liens shall be entitled to credit bid the amounts of their pre-petition claims pursuant to section 363(k) of the Bankruptcy Code. *See* Bidding Procedures § IV(D); Bidding Procedures Order ¶¶ 10 and 11.

d. **Cancelation of the Auction.** If the Debtors do not receive a Qualified Bid (other than the Credit Bid) or otherwise determine not to proceed with the Sale, the Debtors may elect not to conduct the Auction and may cancel the Auction. If the Debtors have received only a Credit Bid, the Debtors may declare the Credit Bid the Successful Bid without conducting the Auction. *See* Bidding Procedures § IV.

e. **Bidding Increments and Overbid (Local Bankr. R. 6004-1(c)(i)(C)).** At the Auction, the Debtors will announce the leading Qualified Bid (the "Auction Baseline Bid"). Bidding on the Assets beyond the Auction Baseline Bid will be done in increments of $100,000 (the "Minimum Overbid Increment"); provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction. In the event that the Debtor selects a Stalking Horse Bidder and grants such bidder a Break-Up Fee and/or an Expense Reimbursement, the initial Minimum Overbid Increment shall be $100,000 plus the amount of such Break-Up Fee and Expense Reimbursement. Additional consideration may include cash, the assumption of debt or marketable securities, a credit bid under section 363(k) of the Bankruptcy Code of an allowed secured claim, other consideration as the Debtors may permit and value in their sole discretion, or any combination thereof.

f. **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(C)).** Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction (other than a Credit Bid submitted by ROS), as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more overbids at the Auction, its final overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is twenty (20) days after entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than twenty five (25) days after the date that the Debtors provide notice to the Backup Bidder that the Successful Bidder failed to

consummate a Sale and that the Debtors desire to consummate the transaction with the Backup Bidder. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (i) the closing of the Sale with the Successful Bidder or (b) the Outside Backup Date; provided, however, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtors provide notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtors fail to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Backup Bidder. *See* Bidding Procedures § IV(D).

g. **Diligence Materials and Data Room.** Any person or entity that wishes to conduct due diligence with respect to the Assets (the "Diligence Materials") must deliver to the Debtors an executed confidentiality agreement. The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to have access to the Debtors' data room (the "Data Room") and other Diligence Materials. *See* Bidding Procedures § III(B).

h. **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).** The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, after consultation with ROS as provided by the DIP Facility, in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customer terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadline set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) reopening the Auction to consider further Bids or Overbids; (d) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (e.g., the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids; provided, however, that nothing herein or in the Bidding Procedures modifies, nor shall be deemed consent by ROS to a modification of, the Milestones set forth in the DIP Term Sheet or any other term, condition, provision, or milestone set forth in the DIP Order or the DIP Loan Documents. *See* Bidding Procedures § VIII.

33.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value and, as such, do not impair the Debtors' ability to consider all qualified bid proposals. Additionally, as noted above, the Bidding Procedures preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value of the Debtors' estates.

15

## II.    The Auction and Sale.

34.    If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an Auction to determine the highest and best Qualified Bid.  This determination shall take into account any factors the Debtors, in consultation with ROS, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, without limitation, the following: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any; (c) the ability of the Qualified Bidder to close the proposed transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (e) any purchase price adjustments; (f) the impact of the transaction on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria").  If no Qualified Bid other than the Credit Bid is received by the Bid Deadline, the Debtors may determine not to conduct the Auction and deem the Credit Bid to be the Successful Bid without conducting the Auction.  The Debtors seek authority from the Court to schedule the Auction on a date as further described in the Bidding Procedures.

## III.    Form and Manner of Sale Notice

35.    On or within two business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form annexed as Exhibit 2 to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) counsel to ROS; (c) counterparties to the Contracts (the "Contract Counterparties"); (d) all parties who have expressed a written interest in the Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets,

LEGAL\29965280\6

including Amgen; (f) the Internal Revenue Service; (g) all other applicable state and local taxing authorities; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder, if any; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

36.    The Debtors (or their agents) shall also serve a notice in substantially the form as that appearing in Exhibit C (the "Creditor Notice") upon all of the parties set forth on the Debtors' creditor matrix who were not served with a Sale Notice.  Finally, the Debtors seek authority, but not the direction, to publish the notice attached hereto as Exhibit D (the "Bidding Procedures Notice") once in *The Wall Street Journal (International Edition),* or such other publication as may be appropriate under the circumstances, within five (5) business days after entry of the Bidding Procedures Order or as soon as practicable thereafter.

## IV.    Summary of the Assumption Procedures.

37.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "Assumption Procedures").  Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as Exhibit 3 (the "Cure and Possible Assumption and Assignment Notice") and Exhibit 4 (the "Assumption Notice") to be sent to the applicable Contract Counterparties.  Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (a) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto; and

17

(b) establish objection and other relevant deadlines and the manner for resolving disputes relating

to the assumption and assignment of the Contracts to the extent necessary.

**Basis for Relief**

I.      **The Relief Sought in the Bidding Procedures Order Is in the
        Best Interests of the Debtors' Estates and Should Be Approved.**

      A.      **The Proposed Notice of the Bidding Procedures
        and the Sale Process Is Appropriate.**

        38.      The Debtors seek to sell the Assets through an Auction and asset sale.  The Debtors

and their advisors, led by the Debtors' investment banker, will conduct an extensive marketing

process.  The Debtors will develop a list of "Contact Parties" who will receive a copy of the

"Information Package" (both as defined in the Bidding Procedures).  The list of Contact Parties

will encompass those parties whom the Debtors believe may be potentially interested in pursuing

a Sale and whom the Debtors reasonably believe may have the financial resources to consummate

such a transaction.  The Bidding Procedures are designed to elicit bids from one or more parties

and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates

for the benefit of creditors.

        39.      Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors

of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the

terms and conditions of a sale, and the deadline for filing any objections.  Bankruptcy Rule

2002(a) is modified by Local Bankruptcy Rule 2002-1(b) which requires service only upon

"counsel for the debtor, counsel for the foreign representative, the United States Trustee, counsel

for all official committees, all parties who file a request for service of notices under Fed. R. Bankr.

P. 2002(i) and all parties whose rights are affected by the motion, as applicable."[6]

---

[6]   The Local Rule further provides that if an official committee of unsecured creditors has not been appointed, then service shall be made on the twenty (20) largest unsecured creditors.

40.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one will be held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

41.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, and publication of the Bidding Procedures Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors further submit that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures, Auction, Sale, or Sale Hearing is required.

### B.     The Bidding Procedures Are Appropriate and Will Maximize Value.

42.     Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361

(Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (*quoting Schipper); In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

43. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

44. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl.*

*Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources,* 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

45.    The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bidding Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

46.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

47.    Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

48.    At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Additionally, if the Debtors select a Stalking Horse Bid, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors obtains fair market value by setting a minimum purchase price for the Assets that will be tested in the

marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above the market.

49. The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this District. *See, e.g., In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bank. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Hldgs, LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09- 11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009); *see also In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).[7]

50. Thus, the Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtors' estates.

## C.    The Overbid Increment Is Appropriate.

51. One important component of the Bidding Procedures is the "Overbid" provision. Once the Debtors determine the Auction Baseline Bid and holds the Auction, all subsequent Overbids must be made in increments of at least $100,000 more than the Auction Baseline Bid

---

[7] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

(the "Initial Minimum Overbid") and then continue in minimum increments of at least $100,000; provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction. In the event that a Stalking Horse Bidder is selected and granted Bid Protections, and that Bid is selected as the Auction Baseline Bid, the Initial Minimum Overbid shall be $100,000 plus the amount of the Break-Up Fee and the Expense Reimbursement.

52.    The Debtors believe that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value received for the Assets while limiting any chilling effect in the marketing process. The Overbid increment is also well within the increment level previously approved by courts in this District. *See In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016) (approving $500,000 bid increment); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

**D.    The Ability to Enter into a Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved.**

53.    Pursuant to the Motion, the Debtors are seeking the pre-approval of this Court to allow the Debtors to choose a Stalking Horse Bidder at any time after entry of the Bidding Procedures Order, and to offer that bidder the Bid Protections without the need to return to court for further approval.

54.    The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment

standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives such as the Break-Up Fee must provide benefit to a debtor's estate.  *Id.* at 533.

55.     *O'Brien* identified at least two situations in which bidding incentives may provide a benefit to the estate:  (1) where "assurance of a break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited"; and (2) where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid. The Debtors submit that the proposed bidding incentives may either induce a bid that otherwise would not be made or, at the very least, would enhance the likelihood that a prospective bidder is induced to research the value of the Debtors' assets in order to submit a minimum or floor bid.

56.     The Debtors believe that, in this case, the proposed bidding incentives are warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid. The ability of the Debtors to offer a Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.  To the extent bids can be improved prior to the Auction, a higher floor is established by the Stalking Horse Bid.  Thus, even if a Stalking Horse Bidder is offered the Bidding Protections and ultimately is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids.  The Debtors will exercise prudent business judgment before offering or agreeing to any of the Bid Protections, and will only do so if such protections, in the reasonable business judgment of the Debtors, will likely result in the result in the realization of greater value for the Debtors and their estates.

LEGAL\29965280\6

57.    Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted pursuant to section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . .  In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *Integrated Resources*, 147 B.R. at 659-60 (emphasis added).    Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotation omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

58.    As a result, courts routinely approve bid protections similar to the Bid Protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and creditors, as these protections will only be employed where a Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

59.    Any Stalking Horse Bidder will have expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that the Debtors will maintain a fiduciary out, and its bid will

be subject not only to Court approval, but also to overbidding by third parties. Any Bid Protections granted to a Stalking Horse Bidder will be negotiated in good faith and at arm's length, with significant give-and-take with respect to those Bid Protections. The Debtors will only agree to the Bid Protections where it will ensure that the Debtors will have the benefit of the transaction with the Stalking Horse Bidder, without sacrificing the potential for interested parties to submit overbids at the Auction.

E.    **The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.**

60.    As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which: (a) the Debtors and the Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code; and (b) Contract Counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "Assumption Procedures").

61.    The Bidding Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

62.    Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed cure amount (the "Cure Amount") and/or (b) reserving amounts with respect to any disputed cure amounts.

LEGAL\29965280\6

63.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

64.    The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof.  Accordingly, the Debtors request that the Court approve the Assumption Procedure set forth in the Bidding Procedures Order.

II.    **Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates.**

A.    **The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.**

65.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re*

· 27

*Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

66.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

67.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

68.    "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action

was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

69.     As set forth above, the Debtors have a sound business justification for selling the Assets. First, the Debtors believe that the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a standalone basis. Moreover, to the extent that the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtors' creditors.

70.     Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bidding Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtors in the exercise of their reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for its estate than any known or practically available alternative. *See, e.g., In re Trans World*

*Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

71.     Thus, the Debtors submit that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.     Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv).[8]**

72.     Pursuant to Local Rule 6004(b)(iv)(C), a sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied. The Sale Order provides that certain claims against the Debtors and/or Purchaser are barred or otherwise waived. *See* Sale Order, ¶¶ 21 and 22.

73.     Pursuant to Local Rule 6004(b)(iv)(E), a sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed

---

[8] If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Assets do not contain a provision that triggers disclosure under that rule.

transaction. As set forth above, the Debtors are subject to the deadlines under the DIP Facility, among which include the Bid Procedures Order be approved by May 15, 2017, that an auction, if necessary under the terms of the Bid Procedures Order, be held by no later than June 9, 2017, and that the Debtors obtain an order of the Bankruptcy Court approving the sale of the Assets by no later than June 16, 2017. *See* DIP Term Sheet, Exhibit 2.

74.     Pursuant to Local Rule 6004(1)(b)(iv)(J), a sale motion must highlight whether, if the debtor proposes to sell substantially all of its assets, the debtor will retain or have reasonable access to its books and records to enable it to administer its bankruptcy case. The proposed Sale Order provides that the Debtors shall have reasonable access to their books and records. *See* Sale Order, ¶ 28.

75.     Pursuant to Local Rule 6004-1(b)(iv)(L), a sale motion should highlight any provision limiting the proposed purchaser's successor liability. The proposed Sale Order provides that Purchaser shall not have any successor liability related to the Debtors or the transferred Assets. *See* Sale Order ¶¶ DD, JJ, 25, and 26.

76.     Pursuant to Local Rule 6004-1(b)(iv)(N), a sale motion must highlight any provision by which the debtor seeks to allow credit bidding pursuant to Bankruptcy Code section 363(k). The Bidding Procedures allow ROS and any holder of a "Permitted Lien" (as defined in the DIP Order) to credit bid the full amount of the obligations under the DIP Order and the DIP Loan Documents and all prepetition claims of ROS in connection with each round of bidding at the Auction. Holders of "Permitted Liens" shall have their credit bidding rights under section 363(k) of the Bankruptcy Code preserved. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, any creditor seeking to exercise a credit bid may only do so for the purchase of Assets against which such creditor holds a first priority lien. To the extent such

creditor seeks to purchase assets that are not subject to such creditor's first priority lien, it must bid cash for such assets. *See* Bidding Procedures § IV(G).

77.    Pursuant to Local Rule 6004-1(b)(iv)(O), a sale motion must highlight any provision whereby the debtor seeks relief from the ten-day stay imposed by Bankruptcy Rule 6004(h). As explained in further detail below, to maximize the value received for the Assets (and consistent with the DIP Facility deadlines), the Debtors seek to close the Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors have requested that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d). *See* Bidding Procedures Order ¶ 29; Sale Order ¶ 27.

C.    **Adequate and Reasonable Notice of the Sale Will Be Provided.**

78.    As described above, the Sale Notice: (a) will be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest.

D.    **The Sale and Purchase Price Will Reflect a Fair-Value Transaction.**

79.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bidding Procedures, including, without limitation, by providing acceptable

bidders with access to the Data Room and requested information. In this way, the number of bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if the Debtors enter into a Stalking Horse Agreement and no auction is held because no auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

E.    **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code.**

80.    The Debtors further submit that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and interests (collectively, the "Interests") pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Transferred Assets, as and to the extent applicable.

81.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

82.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y.

March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided that at least one of the subsections of section 363(f) of the Bankruptcy Code has been satisfied).

83.    The Debtors submit that, excluding assumed agreements, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Consistent with section 363(f)(2) of the Bankruptcy Code, each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets.  Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the Assets free and clear of any such Interests.

F.    **The Assets and the Assigned Contracts Should Be Sold Free and Clear of Successor Liability.**

84.    The Sale Order provides that Purchaser shall not have any successor liability related to Seller or the Transferred Assets to the maximum extent permitted by law.  *See* Sale Order, ¶ 22. Extensive case law establishes that claims against a winning bidder may be directed

to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

85.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (*citing* 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

86.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the

Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104- 05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

87.    The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against Purchaser.  Under section 363(f) of the Bankruptcy Code, Purchaser is entitled to know that the Assets are not tainted by latent claims that could be asserted against Purchaser after the proposed transaction is completed.    Absent that ruling, the value of the Assets could be severely compromised.

88.    Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state that Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

LEGAL\29965280\6

**G.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code; and the Sale of the Assets Does Not Violate Section 363(n) of the Bankruptcy Code.**

89.    The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

90.    Section 363(m), of the Bankruptcy Code provides, in pertinent part: [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

91.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchased or leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

92.    The Debtors submit that the Stalking Horse Bidder, if any, or any other Successful Bidder arising from the Auction would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[9]

93.    First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale will be subject to a market process by virtue of Debtors' marketing efforts, led by its investment banker, and the Auction and will be substantial, fair, and reasonable.

94.    Second, the purchase agreement entered into by the Debtors and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis.

95.    Third, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to section 363(n) of the Bankruptcy Code.

---

[9] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction, if any, and the Bidding Procedures. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.

96.    Finally, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors and ROS.  Accordingly, the Debtors believe that the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

97.    Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, Purchaser should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.  Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.

### H.    Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code.

98.    A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining

that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

99.     In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bidding Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09- 11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted). As provided in the DIP Order, ROS is entitled to credit bid some or all of the claim secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.

## III.     The Assumption and Assignment of the Contracts Should Be Approved.

### A.     The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment.

100.     To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

101.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

102.    The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

103.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).    A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting a test of whether

41

an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; Exide Techs., 340 B.R. at 239.

104.    Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. First, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. Third, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in this chapter 11 case. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

105.    A debtor-in-possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future

LEGAL\29965280\6

performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

106.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

107.    Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

108.    To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

109.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that: "[N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the

trustee may assign such contract or lease under paragraph (2) of this subsection…" 11 U.S.C. § 365(f)(1).

110.    Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998).  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

111.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that: [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses,

may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets. 77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

IV.     **Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

112.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

113.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests that the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

114.    To maximize the value received from the Assets, and to ensure that they are in compliance with the requirements of the DIP Order, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

### Notice

115.    The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtors on a consolidated basis; (c) counsel to ROS and all other entities which hold secured claims against the Debtors; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) all other applicable state and local taxing authorities; (h) the Contract Counterparties; (i) all parties who have expressed a written interest in the Assets within the past two years; (j) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any Interest in the Assets; (k) each governmental agency that is an interested party, if any, with respect to the Sale and transactions proposed thereunder; and (l) all parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

116.    No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully requests that this Court: (a) enter the Bidding Procedures Order, the form of which is attached as Exhibit A hereto; (b) enter the Sale Order, the

form of which is attached as Exhibit B hereto; and (c) grant such other and further relief as is just and proper.

Dated:  April 12, 2017

COZEN O'CONNOR

_____

Mark E. Felger (No. 3919)
Keith L. Kleinman (No. 5693)
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2087
Fax: (302) 295-2013
Email:  mfelger@cozen.com
kkleinman@cozen.com

-and-

COZEN O'CONNOR
Frederick E. Schmidt, Jr. (*pro hac vice* pending)
277 Park Avenue
New York, NY  10172
Telephone: (212) 883-4948
Fax: (646) 588-1552
Email:  eschmidt@cozen.com

*Proposed Counsel For Debtors and Debtors-in-Possession*