# Exhibit B

**Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNILIFE CORPORATION, *et al.*,[1] | ) | Case No. 17-10805 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administration Requested) |

### DECLARATION OF JOHN RYAN, CHIEF EXECUTIVE OFFICER OF UNILIFE CORPORATION IN SUPPORT OF DEBTORS' MOTION FOR APPROVAL OF THE DEBTORS' KEY EMPLOYEE RETENTION PLAN

Pursuant to 28 U.S.C. § 1746, I, John Ryan, hereby submit this declaration (the "Declaration") under penalty of perjury:

1.     I am the Chief Executive Officer and President of Unilife Corporation, Unilife Medical Solutions, Inc. and Unilife Cross Farm LLC (collectively, the "Debtors"). As such, I am intimately familiar with the Debtors' business, day-to-day operations and financial affairs.

2.     I am duly authorized to execute this declaration (this "Declaration") on behalf of the Debtors in support of the Debtors' Motion for Approval of the Debtors' Key Employee Retention Plan (the "Motion"),[2] which seeks approval of the Debtors' key employee retention plan (the "Plan"), a program offering certain payments to compensate all the Debtors' non-insider employees, each of whom are critical to the Debtors' continued operations and successful marketing of their assets as a going concern and resolution of these Chapter 11 cases.

---

[1] The Debtors in these Chapter 11 cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): Unilife Corporation (9354), Unilife Medical Solutions, Inc. (9944), and Unilife Cross Farm LLC (3994). The Debtors' corporate headquarters and the mailing address for each Debtor is 250 Cross Farm Lane, York, PA 17406.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3.    Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, information learned from my review of relevant documents, or information supplied to me by the Debtors' advisors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**Plan Overview and the Debtors' Need to Implement the Plan**

4.    The Debtors' successful resolution of these cases and the maximization of value for the Debtors' stakeholders contemplates a sale of the Debtors' assets as a going concern.  The Debtors' employees are all critical to that endeavor.    As such, the continued retention of the Eligible Employees by the Debtors is crucial to the Debtors' ability to realize the best price possible for their business as a going concern.

5.    Each of the Eligible Employees possesses significant knowledge regarding the Debtors' products, customers and/or intellectual property which will be required in the successful marketing of the Debtors' assets.  In addition, as a result of both significant pre-petition decreases in headcount and the initiation of these Chapter 11 cases, the responsibilities and the use of the time and resources of these Eligible Employees has significantly increased.

6.    Recognizing the negative impact to the value of the Debtors' business if the Eligible Employees were to leave during the sale process, the Debtors' management team, in consultation with their professionals and their proposed debtor-in-possession lender, determined that the implementation of a retention program for the Eligible Employees was in the best interests of the Debtors' estates and all parties in interest.  ROS has approved the Plan and has agreed to the inclusion of all obligations thereunder (so long as the Plan is approved by the Court) within the "Carve-Out" in the proposed *Priming Superpriority Debtor-in-Possession Term Credit Facility Term Sheet* in connection with debtor-in-possession financing for which the Debtors are seeking

Court approval. The "Carve-Out" is to be senior to all claims and liens, as well as any adequate protection liens and claims. Thus, the cost of the Plan payments is to be borne by ROS.

7.    Prior to commencing these cases, the Debtors underwent several rounds of headcount reductions, the result of which was to reduce total employees from over 200 at the beginning of fiscal 2016[3] to 76 as of the Petition Date. Those reductions left the Eligible Employees with no choice but to assume the responsibilities of those employees who left along with meeting their own responsibilities. Some, if not all, of the Eligible Employees may be considering seeking other employment opportunities due to the uncertainty surrounding the Debtors' continued operations and the likelihood that they will become unemployed if the Debtors' efforts to sell their assets as a going concern are unsuccessful. Given the significant pre-petition headcount reductions, the Eligible Employees cannot be easily replaced, if they are replaceable at all.

8.    The Debtors' management team, in consultation with the Debtors' professionals, negotiated the terms of the Plan pursuant to which, if approved, would incentivize the Eligible Employees to remain in the Debtors' employ through the closing of a sale of the Debtors' assets. In exchange for this commitment, the Debtors have agreed to pay retention payments in the maximum aggregate amount of $1,334,551 to the Eligible Employees upon the Trigger Date.

9.    When developing the size and structure of the Plan, the Debtors' management team reviewed the Debtors' compensation package, including severance, and looked to the amount of compensation that the Eligible Employees would receive if they left the Debtors' employ for a competitor. The Plan was prepared in accordance with such payments, the importance of the Eligible Employees to the sale process, and the risk associated with the Debtors' efforts to sell

---

[3] The Debtors operate on a fiscal year ending June 30.

their assets as a going concern. The Debtors' management determined that a base bonus as a percentage of each Eligible Employees' base annual compensation, for employees who are especially critical, would fairly compensate the employees for their increased responsibilities, the risk of remaining in the Debtors' employ and forgoing other employment opportunities.

10.    I am informed by the Debtors' advisors that the Bankruptcy Code places certain limitations on retention payments to "insiders," as that term is defined in section 101(31) of the Bankruptcy Code. I have been informed of the legal standard for determining whether an individual is an insider. I believe that each of the Eligible Employees, while key to the Debtors' success, are not named officers, do not in any way control the Debtors' operations, nor are they involved in corporate governance.

**Conclusion**

11.    Because each of the Eligible Employees is critical to the Debtors' continued operations and ability to sell their assets and resolve these cases, I believe that there would be a detrimental impact to the value of the Debtors' business if the Eligible Employees were to leave and the sale as a going concern was not completed in a timely manner. Therefore, I believe that a sound business justification exists for implementing the Plan and that approval of the Plan is in the best interests of the estates and creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April ⬛ 2017

John Ryan

By: _____

Title: President and Chief Executive Officer