# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNILIFE CORPORATION, et al.,[1] | ) | Case No. 17-10805 (LSS) |
| | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | |

**INTERIM ORDER (I) AUTHORIZING DEBTORS-IN-POSSESSION
TO OBTAIN POSTPETITION SECURED SUPERPRIORITY
FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL,
(III) GRANTING ADEQUATE PROTECTION, (IV) SCHEDULING
FINAL HEARING, AND (V) GRANTING CERTAIN RELATED RELIEF**

Upon the motion dated April 12, 2017 (the "Motion"), seeking entry of an interim

order (this "Interim Order"), *inter alia,*

(a)     authorizing the Debtors to obtain secured postpetition superpriority financing (the
"DIP Facility") on an interim basis pursuant to the terms and conditions of that
certain *Priming Superpriority Debtor-in-Possession Term Credit Facility Term
Sheet* dated as of April 11, 2017, by and among the Debtors and ROS Acquisition
Offshore LP or its designee (the "DIP Lender"), attached hereto as Exhibit A (as
amended, supplemented, restated, or otherwise modified from time to time in
accordance therewith, the "DIP Term Sheet," and together with the other
documents, agreements, and instruments delivered pursuant thereto or executed or
filed in connection therewith, as may be reasonably requested by the DIP Lender,
as such may be amended, supplemented, restated, or otherwise modified from
time to time, the "DIP Loan Documents");[2]

(b)     authorizing the Debtors to execute the DIP Loan Documents, and to perform such
other acts as may be necessary or desirable in connection therewith;

---

[1]  The Debtors in these chapter 11 cases are the following entities (the last four digits of each Debtor's
respective federal tax identification number, if any, follow in parentheses): Unilife Corporation (9354)
("Holdings"), Unilife Medical Solutions, Inc. (9944), and Unilife Cross Farm LLC (3994).  The Debtors'
mailing address for each Debtor is 250 Cross Farm Lane, York, PA 17406.

[2]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the
DIP Term Sheet.

(c)     granting an allowed superpriority administrative expense claim to the DIP Lender;

(d)     granting to the DIP Lender security interests in and liens on the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code as set forth in the DIP Term Sheet to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and this Interim Order and the Final Order (as defined below), as applicable (collectively, the "DIP Loan Obligations");

(e)     authorizing the Debtors to use Cash Collateral (as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(f)     authorizing the Debtors to grant adequate protection to ROS Acquisition Offshore LP, as lender under that certain *Credit Agreement* dated as of March 12, 2014 (as it has been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (as defined below) (the "Existing Credit Facility" and together with all agreements, documents, notes, mortgages, security agreements, pledges, guaranties, subordination agreements, instruments, amendments, and any other agreements and documents delivered pursuant thereto or in connection therewith, the "Existing Loan Documents") by and between the Company, as borrower, and ROS Acquisition Offshore LP, as lender (in its capacity as such, the "Existing Lender"); and

(g)     scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of a final order (the "Final Order"), *inter alia*, approving and authorizing the Postpetition Financing Arrangement (including, without limitation, the advance under the DIP Facility contemplated by this Interim Order) on a final basis pursuant to the DIP Loan Documents;

and the interim hearing on the Motion (the "Interim Hearing") having been held on April 13, 2017; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the interim relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

      A.      <u>Petition Date</u>. On April 12, 2017 (the "<u>Petition Date</u>"), the Debtors

commenced their chapter 11 cases (these "<u>Chapter 11 Cases</u>") by filing voluntary petitions for

relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the

United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"). The Debtors are

operating their businesses and managing their affairs as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner,

or official committee of creditors holding unsecured claims (a "<u>Creditors' Committee</u>") has been

appointed in any of these Chapter 11 Cases.

      B.      <u>Jurisdiction; Venue</u>. The Court has jurisdiction over these Chapter 11

Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). The Court is a proper venue of these Chapter

11 Cases and the Motion under 28 U.S.C. §§ 1408 and 1409.

      C.      <u>Notice</u>. Notice of the Motion has been provided to: (i) the Office of the

United States Trustee; (ii) the Office of the United States Attorney for the District of Delaware;

(iii) the Internal Revenue Service; (iv) the Debtors' twenty (20) largest unsecured creditors on a

consolidated basis; (v) counsel to the Existing Lender and the DIP Lender; (vi) counsel for

Amgen; and (vii) all other known parties asserting a lien against any of the Debtors' assets, in

each case by telecopy, email, overnight courier, and/or hand delivery. Because of the nature of

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

the relief requested, the Debtors respectfully submit that no other or further notice of the relief requested in this Motion need be given.

        D.    Debtors' Acknowledgments and Stipulations.   In requesting the Postpetition Financing Arrangement, and in exchange for and as a material inducement for the DIP Lender and the Existing Lender to agree to provide the Postpetition Financing Arrangement, the Debtors acknowledge, represent, stipulate, and agree, subject to the challenge rights set forth in paragraph 13 herein, as follows:

        (i)    The Debtors and the Existing Lender entered into the Existing Credit Facility pursuant to which the prepetition borrowers obtained secured financing from the Existing Lender, guaranteed by the prepetition guarantors (collectively, the "Prepetition Obligations").

        (ii)    The Prepetition Obligations are secured by valid, enforceable, duly perfected, and non-avoidable liens and security interests granted to the Existing Lender on substantially all of the Debtors' assets and on substantially all of the assets of non-debtor subsidiaries Unilife Medical Solutions Limited and Unitract Syringe Pty Limited, including Cash Collateral (the "Prepetition Liens").

        (iii)    The Prepetition Liens are senior, first-priority liens on all of the collateral, except for (x) any items of the collateral that are, as of the Petition Date, subject to valid, enforceable, duly perfected, and non-avoidable first-priority liens of third parties as set forth in the schedules to, or as otherwise permitted under, the Existing Loan Documents; and (y) the Amgen Collateral, as defined, and to the extent provided, in the Amgen Intercreditor Agreement

4

(as defined in the DIP Term Sheet ) (collectively, (x) and (y) above, the "Permitted Liens," and the items of collateral securing the Permitted Liens collectively, the "Permitted Lien Collateral"). All "Collateral" as defined in the Existing Credit Facility granted or pledged by the Debtors to the Existing Lender pursuant to any of the Existing Loan Documents shall be collectively referred to as the "Prepetition Collateral."

      (iv)    As of the Petition Date, (a) the aggregate amount of principal and accrued interest owed under the Existing Loan Documents to the Existing Lender is approximately $86.7 million together with fees, expenses, and other additional amounts that are chargeable or otherwise reimbursable under the Existing Loan Documents; (b) all of the Prepetition Obligations are unconditionally owing by the Debtors to the Existing Lender; and (c) the Prepetition Obligations are not subject to any avoidance, reductions, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as and to the limited extent expressly set forth in paragraph 13 herein.

      (v)    The Prepetition Liens constitute valid, binding, enforceable, and duly perfected liens and security interests, with priority over any and all other liens and security interests other than (only in respect of the Permitted Lien Collateral) the Permitted Liens, and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, recoupment, defenses, or any other challenges under

the Bankruptcy Code or any applicable law or regulation by any person or entity, except as and to limited extent expressly set forth in paragraph 13 herein.

(vi)    The Debtors have waived, discharged, and released any right they may have to challenge the Prepetition Obligations or the Prepetition Liens on the Prepetition Collateral, or to assert any offsets, recoupment, defenses, claims, objections, challenges, causes of action and/or choses of action against the Existing Lender, with respect to the Prepetition Obligations, the Prepetition Liens, or the Prepetition Collateral, or any matters arising therefrom or related thereto.

(vii)    Any payments made on account of the Prepetition Obligations before the Petition Date were (a) payments out of the Prepetition Collateral or (b) made in the ordinary course of business and did not diminish any property otherwise available for distribution to unsecured creditors.

(viii)    All of the Debtors' cash, including the cash in their deposit accounts, securities accounts, and any other accounts, wherever located, whether as original collateral or as proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Existing Lender.

E.    Postpetition Financing.

(i)    Neither the DIP Lender nor the Existing Lender (collectively, the "Secured Parties") is a control person or insider of the Debtors by virtue of any of the actions taken by them in respect of or in connection with the Postpetition Financing Arrangement or the Prepetition Obligations or otherwise.

(ii)    Upon approval of this Interim Order by the Court, the Debtors need not obtain any other authorizations, consents, or approvals, or make any filings with or give any notices to, any federal, state, or local governmental agencies, authorities, or instrumentalities, in connection with the execution, delivery, validity, enforceability, and priority of the DIP Loan Documents to which any Debtor is a party and the use of Cash Collateral.

(iii)    Until such time as all DIP Loan Obligations are indefeasibly paid in full in cash, and except for existing prepetition Permitted Liens and for the liens and security interests granted in this Interim Order or, to the extent contemplated by the Motion, in the Final Order, no other liens or security interests shall attach to, or be granted in, any property of the Debtors' estates or their non-debtor subsidiaries.    Without limiting the foregoing, except for existing prepetition Permitted Liens, the Debtors shall not grant, create, or suffer any lien or security interest in any property of their estates or their non-debtor subsidiaries and shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lender or the Existing Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral or the Replacement Liens (as defined below) pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except as provided herein for the Carve-Out (as defined below).

(iv)    Until such time as all DIP Loan Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors' estates of any kind or nature whatsoever that is superior to, or *pari passu* with, the DIP Superpriority Claim (as defined below) or the Adequate Protection Claim (as

defined below) provided herein, including, without limitation, any claims of the kind specified in, or arising or ordered under, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 or 1114 of the Bankruptcy Code, except as provided herein for the Carve-Out.

      F.    <u>Cash Collateral</u>.  For purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the Existing Lender holds a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

      (i)    all cash proceeds arising from the collection, sale, lease, or other disposition, use, or conversion of any property, insurance policies, or in or on which the Existing Lender has a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

      (ii)    all of the respective deposits, refund claims, and rights in retainers of the Debtors on which the Existing Lender has a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

      (iii)    the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order; and

(iv)    any and all other "cash proceeds" (as defined in the Uniform Commercial Code as enacted in the State of New York) of the DIP Collateral or the Prepetition Collateral, or of any proceeds thereof.

G.    Adequate Protection.  The Existing Lender is entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection to the extent of any diminution in the value of its interests in the Prepetition Collateral, including the Cash Collateral, resulting from, among other things, (a) the incurrence of the priming DIP Loan Obligations, (b) the use of Cash Collateral, (c) the granting of the DIP Liens (as defined below) and the DIP Superpriority Claim, (d) the acquiescence of the Existing Lender in the Carve-Out, (e) any other diminution in the value of the Prepetition Collateral, and (f) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

H.    Purpose and Necessity of Financing.  As discussed in the Motion, the Debtors require the financing under the DIP Facility (the "DIP Loans") (i) to maximize and preserve the value of their businesses pending the sale of substantially all of their assets or consummation of a plan of reorganization, (ii) to satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget (as defined below), (iii) to pay fees and expenses related to the DIP Loan Documents and these Chapter 11 Cases, and (iv) for such other purposes as are set forth in the DIP Loan Documents.  If the Debtors do not obtain authorization to borrow under the DIP Loan Documents, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense

under section 503 of the Bankruptcy Code, or other sufficient financing under section 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender superpriority claims, liens, and security interests, pursuant to section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including, without limitation, the financing pursuant to this Interim Order, represents the best financing available to them at this time.

I.      Good Cause Shown. Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to preserve the value of the Debtors' businesses pending a sale of substantially all of their assets or the consummation of a plan. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates and, accordingly, is in the best interests of the Debtors, their estates, and their creditors.

J.      Sections 506(c) and 552(b) Waivers. In light of (i) the DIP Lender's agreement to the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Facility and (ii) the Existing Lender's agreement to the Carve-Out

and the DIP Liens, and to permit the use of its Cash Collateral for payments made in accordance with the Approved Budget and the terms of this Interim Order, the Secured Parties are each entitled to (1) subject to entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (2) subject to entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K.    Good Faith.  The terms of the DIP Loan Documents are more favorable to the Debtors than those available from any alternative sources.  Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's length.  Any DIP Loans and other financial accommodations made to the Debtors pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to all protections and benefits afforded thereby.

L.    Fair Consideration and Reasonably Equivalent Value.    Each of the Debtors has received and will receive fair consideration and reasonable value in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.    Immediate Entry of Interim Order.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary

to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary to sustain the continued operations of the Debtors and further enhance the Debtors' prospects of a reorganization or for a successful sale of substantially all of their assets. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Disposition</u>. The Motion is granted on an interim basis on the terms set forth in this Interim Order. Any objection to the interim relief sought in the Motion that has not previously been withdrawn or resolved is hereby overruled on its merits. The term of the DIP Loans and the use of Cash Collateral authorized hereunder shall expire, and the DIP Loans made pursuant to this Interim Order and the DIP Loan Documents will mature and, together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become immediately due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) without further notice or hearing on the earlier of (a) May 16, 2017, if the Final Order has not been entered by the Court prior to such date, and (b) the Termination Date (as defined below).

## AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL

2.    Authorization for DIP Financing and Use of Cash Collateral.

(a)    The Debtors are hereby authorized, on an interim basis, to incur the DIP Loan Obligations immediately, subject to the terms of this Interim Order, the Approved Budget, and the DIP Loan Documents, in the aggregate during the period prior to the entry of the Final Order of up to $1 million as provided in the Approved Budget (the "Interim Borrowing"), with the maximum amount to be borrowed after entry of the Final Order not to exceed $7.5 million (inclusive of the Interim Borrowing) (the "Total Commitment").    Available financing and advances under the DIP Loan Documents shall, on an interim basis, be made consistently with the terms set forth in the Approved Budget and the DIP Loan Documents, and shall provide for the payment of interest, fees, and expenses in accordance with this Interim Order and the DIP Loan Documents, and of any other amounts required or allowed to be paid in accordance with this Interim Order.    The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the Approved Budget, and the DIP Loan Documents, without further approval by the Court.

(b)    Approved Budget.    The Debtors have delivered to the DIP Lender and Existing Lender a budget that has been approved by each of the DIP Lender and the Existing Lender (the "Approved Budget") for the time period from and including the Petition Date through June 30, 2017.    A copy of the Approved Budget is attached hereto as Exhibit B.    The Debtors shall provide to the DIP Lender, the Existing Lender, and Amgen updates to the Approved Budget and financial reporting with respect to the Debtors in accordance with the

terms of the DIP Loan Documents. Funds borrowed under the DIP Loan Documents and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with this Interim Order. The consent of the DIP Lender to the Approved Budget shall not be construed as a commitment to provide DIP Loans or to permit the use of Cash Collateral after the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(c)    By not later than four (4) business days after the end of the week following the Petition Date, the Debtors shall deliver to the Existing Lender, the DIP Lender and Amgen a variance report in form and substance acceptable to the Existing Lender and the DIP Lender in their sole and absolute discretion (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget. Thereafter, Debtors shall deliver to the DIP Lender, the Existing Lender and Amgen, by not later than four (4) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four (4) week period (or, if fewer than four weeks have elapsed since the Petition Date, then for the trailing one-, two-, or three-week period, as applicable). Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the "Permitted Variances," which means, in each case measured on a cumulative basis, (x) up to 10% for cash disbursements measured weekly on a line-item basis, (y) up to 20% for cash receipts measured every three weeks on a line-item basis, or (z) up to 10% in the aggregate for all cash disbursements as set forth in the DIP Term Sheet ("Permitted Variances").

(d)     The DIP Lender (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget, except for the Carve-Out as provided by this Interim Order.  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time with the written consent of the DIP Lender in its sole and absolute discretion.

(e)     In connection with any challenge pursuant to paragraph 13 hereof, to the extent that any court order is entered directing disgorgement of any payments made by the Debtors to the Existing Lender, either before or after the Petition Date, all proceeds recovered by the Debtors' estates in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Loan Obligations until the DIP Loan Obligations are indefeasibly paid in full in cash.

3.     <u>Authority to Execute and Deliver Necessary Documents.</u>

(a)     Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, including, without limitation, any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as contemplated by the DIP Term Sheet or as may be reasonably requested by the DIP Lender.

(b)     Each of the Debtors is further authorized to perform all of its obligations and acts required under the DIP Loan Documents, and such other agreements as may be required

by the DIP Loan Documents to give effect to the terms of the financing provided for therein, and in this Interim Order.

4.    <u>Valid and Binding Obligations</u>.  All obligations under the DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them and their bankruptcy estates and each of their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee), in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    <u>Authorization for Payment of DIP Financing Fees and Expenses</u>.  All fees payable, and costs and/or expenses reimbursable under this Interim Order or the DIP Loan Documents (including, without limitation, all reasonable fees, costs, and expenses referred to in the DIP Loan Documents and the DIP Lender's reasonable attorneys' fees and expenses, whether incurred prepetition or postpetition) shall be paid by the Debtors to the DIP Lender (collectively, the "<u>DIP Lender Fees and Expenses</u>").  The Debtors are hereby authorized to pay all such fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without the need for filing any further application, pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  The Debtors shall pay all reasonable prepetition and postpetition out-of-pocket costs and expenses of the DIP Lender

(including all reasonable fees, expenses, and disbursements of outside counsel, including any

local counsel, and consultants) in connection with these Chapter 11 Cases and any Successor

Cases (as defined below), including, without limitation, for (a) the preparation, execution, and

delivery of the DIP Loan Documents, this Interim Order, and any Final Order, and the funding of

all DIP Loans under the Postpetition Financing Arrangement; (b) the administration of the

Postpetition Financing Arrangement and any amendment or waiver of any provision of the DIP

Loan Documents, this Interim Order, and any Final Order; and (c) the enforcement or protection

of any of their respective or collective rights and remedies under the DIP Loan Documents, this

Interim Order, and any Final Order.  None of the DIP Lender Fees and Expenses shall be subject

to the prior approval of this Court. Under no circumstances shall the DIP Lender's professionals

be required to submit invoices in any particular format, and no recipient of any payment of such

professional fees shall be required to file with respect thereto any interim or final fee application

with this Court.  Any DIP Lender Fees and Expenses shall be paid within five (5) business days

of delivery of a summary invoice (redacted for privilege) to the Debtors, with a copy of each

such invoice (also redacted for privilege) to be delivered by the Debtors to the U.S. Trustee and

any Creditors' Committee and without the need for further application to or order of the Court.

      6.     <u>Amendments, Consents, Waivers, and Modifications</u>

      (a)   The Debtors, with the express written consent of the DIP Lender and the

Existing Lender (each in its sole and absolute discretion), may enter into any nonmaterial

amendments, consents, waivers, or modifications to the DIP Loan Documents without the

need for further notice or hearing or any order of this Court.  Material amendments, consents,

waivers, and modifications (each, a "<u>Material Modification</u>") of the DIP Loan Documents

shall require the approval of the Court,  <u>provided that</u>, the Debtors, the DIP Lender or the

Existing Lender may seek such approval for a Material Modification on five (5) business days' written notice to the U.S. Trustee, counsel for any Creditors' Committee, counsel to Amgen and parties who have requested notice under Bankruptcy Rule 2002(i). Absent objection by such deadline, the parties may submit an order approving a Material Modification for consideration without a hearing.

(b)    The budget annexed to this Interim Order shall constitute the Approved Budget for the period commencing with the Petition Date through and including the Outside Date. The Debtors, with the express written consent of the DIP Lender and the Existing Lender (each in its sole and absolute discretion), may enter into any nonmaterial revisions to the Approved Budget without the need for further notice or hearing or any order of this Court. A material revision to the Approved Budget shall require the approval of the Court following notice and a hearing, provided that, the Debtors, the DIP Lender or the Existing Lender may seek approval for a material revision on five (5) business days' written notice to the U.S. Trustee, counsel for any Creditors' Committee, counsel to Amgen and parties who have requested notice under Bankruptcy Rule 2002(i). Absent objection by such deadline, the parties may submit an order approving a revised budget for consideration without a hearing.

## DIP LIENS AND DIP SUPERPRIORITY CLAIM

7.    DIP Lender's Lien Priority.

(a)    To secure the DIP Loan Obligations, the DIP Lender is hereby granted (x) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, enforceable and fully perfected first-priority lien and security interest on all DIP Collateral that is not otherwise subject to a lien, (y) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, enforceable and fully perfected

18

lien and security interest on all DIP Collateral that is junior to the Permitted Liens and senior to

the Prepetition Liens, and (z) pursuant to section 364(d)(1) of the Bankruptcy Code, a valid,

enforceable and fully perfected first-priority priming lien and security interest that is senior to the

Prepetition Liens (collectively, the "DIP Liens").  Upon entry of this Interim Order, the DIP

Liens shall attach with the foregoing priorities to all of the property, assets, and interests in

property or assets of each Debtor, and all "property of the estate" (within the meaning of the

Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible,

intangible or mixed, now existing or hereafter acquired or created (the "DIP Collateral"),

provided that, the DIP Collateral shall not include avoidance actions under chapter 5 of the

Bankruptcy Code ("Avoidance Actions") unless and until the Final Order so provides.  The DIP

Collateral shall include, without limitation, all of each Debtor's now owned or hereafter acquired

right, title, and interest in and to all cash, accounts, accounts receivable, commercial tort claims,

general intangibles, payment intangibles, all Intellectual Property (as that term is defined in the

Existing Credit Facility), inventory, equipment, real estate, documents, instruments, deposit

accounts, tax refunds, contract rights, chattel paper, investment property, letters of credit and

letter-of-credit rights, money, fixtures, leasehold interests, all intercompany claims, any and all

proceeds arising from insurance policies including, without limitation, policies for the benefit of

directors and officers of the Debtors to the extent such policies and proceeds are property of the

Debtors, all claims and causes of action of the Debtors or their respective estates in the Chapter

11 Cases (subject, in the case of any Avoidance Actions, to entry of the Final Order), and any

and all proceeds, profits, and products from all of the foregoing collateral, all supporting

obligations therefor, and all accessions thereto, and the equity interests of each direct and indirect subsidiary of Holdings. The DIP Liens on the DIP Collateral shall be subject only to (i) the Permitted Liens and (ii) the Carve-Out.

(b)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest, or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, subject to (i) the Permitted Liens and (ii) the Carve-Out.

(c)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, with the priorities set forth in this Interim Order, without the necessity of execution by the Debtors of any mortgages, security agreements, pledge agreements, financing agreements, financing statements, filings in the U.S. Patent and Trademark Office or the U.S. Copyright Office, or any other agreements, instruments, documents, notices, recordations, or filings, domestic or foreign, such that no additional actions need be taken by the DIP Lender, or any other person or entity to perfect such interests or to create the priorities set forth in this Interim Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, certificate of title, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, nongovernmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise

transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Lender a first-priority security interest in such fee, leasehold, or other interest or other collateral or the proceeds of any assignment, sale, or other transfer thereof, by any of the Debtors in favor of the DIP Lender, in accordance with the terms of the DIP Loan Documents. Notwithstanding anything to the contrary herein, nothing in this Interim Order shall affect, impair, or otherwise prejudice any rights that the Debtors' landlords may have or have the effect of encumbering, pledging, or collateralizing the leasehold interests of the Debtors with respect to premises owned by such landlord to the extent otherwise prohibited under the terms of the applicable lease with such landlord.

8.    DIP Lender's Superpriority Claim. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases and in any successor cases under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Cases") for all DIP Loan Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. Notwithstanding the foregoing and solely for the purposes of this Interim

Order, the allowed DIP Superpriority Claims shall not be payable from the proceeds of Avoidance Actions, provided that the DIP Loan Obligations shall nevertheless be payable on a pari passu basis with other allowed administrative expenses from the proceeds of Avoidance Actions. Notwithstanding anything to the contrary herein, the DIP Superpriority Claim granted in this paragraph shall be subject to payment of the Carve-Out. Except as set forth herein, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case.

## ADEQUATE PROTECTION

9.    Adequate Protection for Existing Lender. As adequate protection for the diminution, if any, in the value of the Existing Lender's interests in the Prepetition Collateral, resulting from, among other things, (a) the incurrence of the priming DIP Loan Obligations, (b) the use of Cash Collateral, (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the acquiescence of the Existing Lender in the Carve-Out, (e) any other diminution in the value of the Prepetition Collateral, and (f) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution"), the Existing Lender is hereby granted the following ((a) through (e) below shall be referred to collectively as the "Prepetition Adequate Protection Rights"):

(a)    Replacement Liens. To secure the Adequate Protection Claim, the Existing Lender is hereby granted valid, enforceable, and fully perfected postpetition security interests and liens (collectively, the "Replacement Liens") in all of the DIP Collateral, provided, however, that (i) solely for the purposes of this Interim Order, the Replacement Liens shall not

attach to Avoidance Actions and (ii) the Replacement Liens shall be and remain subject and subordinate to (A) the DIP Liens (B) the Permitted Liens and (C) the Carve-Out.    The Replacement Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, with the priorities set forth in this Interim Order, without the necessity of execution by the Debtors of any mortgages, security agreements, pledge agreements, financing agreements, financing statements, filings in the U.S. Patent and Trademark Office or the U.S. Copyright Office, or any other agreements, instruments, documents, notices, recordations, or filings, domestic or foreign, such that no additional actions need be taken by the Existing Lender, or any other person or entity to perfect such interests or to create the priorities set forth in this Interim Order.

(b)    Adequate Protection Superpriority Claim.    As further adequate protection, the Existing Lender is hereby granted a superpriority claim for the Diminution, which claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c),  552(b), 726, 1113 or 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Claim"), provided, however, that, solely for the purposes of this Interim Order, the Adequate Protection Claim shall not be paid from the proceeds of Avoidance Actions.    The Adequate Protection Claim shall be subordinate only to the DIP Superpriority Claim and the Carve-Out.

(c)    <u>Consent to Priming and Adequate Protection</u>.    The Existing Lender consents to the use of Cash Collateral to the extent set forth herein, the priming provided for herein, and the Approved Budget; <u>provided</u>, <u>however</u>, that (i) such consent is expressly conditioned upon the entry of this Interim Order (in form and substance satisfactory to the Existing Lender), (ii) such consent shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the DIP Loans provided by the DIP Lender under the DIP Loan Documents, (iii) such consent shall not be deemed a basis to deny or impair the Existing Lender's entitlement to the Prepetition Adequate Protection Rights, and (iv) such consent shall be of no force and effect in the event that this Interim Order is not entered or is vacated or is modified in any respect without the consent of the DIP Lender and the Existing Lender, or if the DIP Loan Documents or DIP Loans as set forth herein and therein are not approved.

(d)    <u>Credit Bid</u>.    Nothing in this Interim Order shall be construed to deprive the DIP Lender of the right to "credit bid" the DIP Loan Obligations pursuant to section 363(k) of the Bankruptcy Code, subject to the terms of the Amgen Intercreditor Agreement.

(e)    <u>Further Adequate Protection</u>.    Nothing in this Interim Order shall, or shall be deemed to, limit, abridge, or otherwise affect the rights of the Existing Lender to request at any time that the Court provide additional or further protection of its interests in the Prepetition Collateral (including the Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate.

10.    Survival of DIP Liens, DIP Superpriority Claim, Replacement Liens, and Adequate Protection Claim.  The DIP Liens, DIP Superpriority Claim, Replacement Liens, and Adequate Protection Claim, and other rights and remedies granted under this Interim Order to the Secured Parties, shall continue in this and any Successor Cases and shall be valid and enforceable against any chapter 11 or chapter 7 trustee or trustees appointed in any or all of the Debtors' Chapter 11 Cases or any Successor Cases and/or upon the conversion or dismissal of any or all of the Debtors' Chapter 11 Cases or any Successor Cases, and such liens and security interests shall maintain their respective priority as provided in this Interim Order until all the DIP Loan Obligations and Adequate Protection Claim have been indefeasibly paid in full in cash and the Secured Parties' commitments have been terminated in accordance with the DIP Loan Documents.

## CARVE-OUT; RESTRICTIONS ON USE OF FUNDS

11.    Carve-Out.

(a)    Only if and to the extent sufficient unencumbered funds are not available from any of the Debtors' estates at the time a payment is otherwise due, the DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Adequate Protection Claim, and the Prepetition Liens shall be subject, in accordance with the priority as set forth herein and subordinate only (except as otherwise provided in subparagraph (d) hereof) to, and proceeds thereof may be used to pay: (a) unpaid fees and expenses required to be paid by the Debtors to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) reasonable fees and expenses incurred by a trustee in the Successor Cases (collectively) under

section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (c) the amounts approved by the Court to be paid by the Debtors to the current employees under the Debtors' Key Employee Retention Plan ("KERP") and Key Employee Incentive Plan ("KEIP"), provided that DIP Lender shall have approved in writing, in its sole and absolute discretion, the form and content of the KERP and KEIP plans, including without limitation the conditions for, and timing of, any payments thereunder; (d) to the extent allowed at any time and only up to the cumulative amounts for each such professional (including the noticing agent) set forth in the Approved Budget (and only if the retention of such professional (including the noticing agent) has been approved pursuant to a final order of the Bankruptcy Court), accrued and unpaid (net of any prepetition retainers) reasonable fees, disbursements, costs, and expenses incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) by any professionals retained by the Debtors or the Creditors' Committee, whether allowed by the Bankruptcy Court prior to or after the date of a Carve-Out Trigger Notice (the "Professional Fees"); and (e) to the extent allowed at any time, reasonable fees, disbursements, costs, and expenses of any professionals retained by the Debtors or the Creditors' Committee incurred after the first business day following delivery by the Agent of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (e) being the "Post-Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender (which delivery shall be made via electronic mail and overnight delivery) to the Debtors and their counsel, the United States Trustee, counsel to Amgen, and counsel to any Creditors'

26

Committee, which notice may only be delivered following the occurrence and during the continuance of an Event of Default (as defined below), and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    To the extent that advances are made under the DIP Facility on account of Professional Fees set forth in the Approved Budget, such advances shall be deemed to correspondingly reduce the Carve-Out, whether or not such funds are disbursed to or for the benefit of such professionals.

(c)    The Carve-Out does not include any Permitted Variances.

(d)    Nothing contained in this Interim Order shall be construed: (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the Secured Parties to object to the reasonableness of such amounts or on any other basis.

(e)    Prior to the Termination Date, and so long as a Carve-Out Trigger Notice has not been delivered, the Debtors are authorized and directed to wire transfer funds, on a monthly basis, to a Cozen O'Connor client trust account (the "Account") in the amount equal to, but not to exceed, the Professional Fees budgeted for professionals retained by the Debtors and the Committee (the "Retained Professionals") for each such month (the "Budgeted Professional

Expenses"). Neither the DIP Lender nor the Existing Lender shall have any responsibility, liability or obligation whatsoever to ensure that the Debtors fund the Account or that the Account has funds equal to the aggregate amount of Budgeted Professional Expenses for any applicable period. The Debtors are only authorized and directed to fund the Account up to, but not to exceed, the amount of Budgeted Professional Expenses set forth in the Budget for any month. Such funds shall be held for the benefit of the Retained Professionals, to be applied to the fees and expenses of the Retained Professionals that are approved for payment pursuant to one or more orders of this Court. Any fees and expenses payable to the Retained Professionals shall be paid first out of the Account, and all amounts deposited in the Account shall reduce, on a dollar-for-dollar basis, the Carve-Out. Any excess amounts in the Account after payment of the fees of the professional persons shall be distributed to the DIP Lender or the Existing Lender, if the DIP Loans are no longer outstanding. The funds in the Account shall remain DIP Collateral and Prepetition Collateral unless and until such funds are paid to the Retained Professionals.

12. <u>Restrictions on Use of Funds</u>.

(a) Notwithstanding anything to the contrary in this Interim Order or in the DIP Loan Documents, no loan proceeds under the Postpetition Financing Arrangement, no DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral), and no portion of the Carve-Out may be used to pay any fees or expenses or claims for services rendered by any of the professionals retained by the Debtors, by any Creditors' Committee, by any creditor or other party in interest, by any other committee, by any trustee appointed in any of these Chapter 11 Cases or in any Successor Cases, or for any other party to (i) request

28

authorization to obtain postpetition loans or other financial accommodations pursuant to section

364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lender in

accordance with the DIP Loan Documents; or (ii) investigate (except as set forth in paragraph

12(b) below), assert, join, commence, support, or prosecute any action or claim, counter-claim,

action, proceeding, application, motion, objection, defense, or other contested matter or

adversary proceeding seeking any order, judgment, determination, or similar relief against, or

adverse to the interests of, in any capacity, the Secured Parties, or any of their respective officers,

directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any

transaction, occurrence, omission, or action, including, without limitation, (A) any Avoidance

Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action relating

to any act, omission, or aspect of the relationship between any of the Secured Parties, on the one

hand, and the Debtors or any of their affiliates, on the other; (C) any action with respect to the

validity and extent of the DIP Loan Obligations or the Prepetition Obligations, or the validity,

extent, and priority of the DIP Liens, the Prepetition Liens, or the Replacement Liens; (D) any

action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens,

the Prepetition Liens, or the Replacement Liens; (E) any action that has the effect of preventing,

hindering or delaying (whether directly or indirectly) the Secured Parties in respect of their liens

and security interests in the Collateral, Cash Collateral or the Prepetition Collateral, except to

contest the occurrence or continuance of any Event of Default; (F) pay any claim of a creditor (as

such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP

Lender and the Existing Lender except as set forth in the Approved Budget; or (G) use or seek to

use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition Collateral, unless otherwise expressly permitted hereby, without the express written consent of the DIP Lender and the Existing Lender, each in their sole and absolute discretion.

(b)     Notwithstanding the foregoing, up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral, or loan proceeds under the DIP Facility may be used by the Creditors' Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity, and priority of the Prepetition Obligations, the Prepetition Liens, or any other claims against the Existing Lender, so long as such investigation occurs within the Challenge Period (as defined below).

13.     <u>Reservation of Certain Third-Party Rights and Bar of Challenges and Claims</u>.

(a)     The Debtors' acknowledgements and stipulations set forth in Paragraph D above and the releases set forth in paragraph 14 below (the "<u>Debtors' Stipulations</u>") shall be final and binding upon the Debtors in all circumstances upon entry of this Interim Order.   The Debtors' Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless a Challenge (defined below) is commenced within the Challenge Period (defined below) and a final, non-appealable order is entered sustaining any such Challenge.

(b)     "Challenge" and "Challenges" shall mean individually or collectively: (i) an adversary proceeding or contested matter against the Existing Lender challenging the admissions, stipulations, findings, or releases included in the Debtors' Stipulations or (ii) an adversary proceeding or contested matter against the Existing Lender in connection with or

related to (A) the Existing Credit Facility; (B) the prepetition business relationship between or conduct of the Existing Lender with the Debtors; (C) alleged actions or inactions of the Existing Lender arising out of or related to the Prepetition Obligations or otherwise, including, without limitation, any claim against the Existing Lender in the nature of an "equitable subordination," "lender liability," "deepening insolvency," or "control person" liability; (D) any avoidance, offset, recoupment, counterclaim, or defense to the Prepetition Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code), or (E) any avoidance of or challenge (whether pursuant to chapter 5 of the Bankruptcy Code or otherwise) to any transfer made by or on behalf of the Debtors to or for the benefit of the Existing Lender.

(c)    Any Challenge under this paragraph must be commenced by the later of (i) the sixtieth (60th) calendar day after the formation of any Creditors' Committee and (ii) the seventy-five (75th) calendar day following the date of entry of this Interim Order (the "Challenge Period.")

(d)    The "Challenge Period Termination Date" shall be (i) if no Challenge is filed during the Challenge Period, the next calendar day after the termination of the Challenge Period or (ii) if a Challenge is filed during the Challenge Period, the date that is one day after any Challenge is fully and finally adjudicated.

(e)    Except as may otherwise be fully and finally adjudicated in a timely Challenge, upon the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases, (i) all payments made to or for the benefit of the Secured Parties pursuant

to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, offset, recoupment, subordination, recharacterization, defense, or avoidance; (ii) any and all Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the Prepetition Obligations shall be deemed to be secured by a valid, enforceable, duly perfected, and non-avoidable security interest and lien in the Prepetition Collateral; (iv) the Prepetition Obligations shall be deemed to be a fully allowed claim; and (v) the Debtors' Stipulations shall be binding on all parties in interest, including any Creditors' Committee or any trustee or trustees appointed in these Chapter 11 Cases or any Successor Cases.

(f)    For the avoidance of doubt, if a Chapter 11 trustee is appointed or the Chapter 11 Case is converted to Chapter 7 prior to the expiration of the Challenge Period, the Chapter 11 trustee or Chapter 7 trustee, as applicable (and in either instance, the "trustee"), shall have until the later of (1) the expiration of the Challenge Period or (2) the tenth (10th ) day (or first business day thereafter if the tenth day is a Saturday, Sunday or legal holiday) after the appointment of the Chapter 11 trustee or the conversion of the Chapter 11 Case to Chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court.  If any party in interest (including a Creditors' Committee) has commenced a Challenge prior to appointment of a Chapter 11 trustee or conversion of the Chapter 11 Case to Chapter 7, the trustee shall be entitled to elect to be substituted as the plaintiff or moving party and assume control of the Challenge.  Whether the trustee commences a Challenge or assumes control of an existing Challenge, the trustee shall not, for the purpose of such Challenge, be bound by the

Debtors' stipulations, acknowledgments, admissions, confirmations, releases, and waivers in this Order.

14.    <u>Release</u>.    The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 14 shall be deemed effective upon entry of this Interim Order and subject only to the rights set forth in paragraph 13 above.  The Debtors forever and irrevocably (i) release, discharge, and acquit the Existing Lender, and each of its respective former or current officers, employees, directors, affiliates, agents, representatives, owners, members, partners, financial advisors, legal advisors, managers, consultants, accountants, attorneys, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, relating to any aspect of the relationship between the Existing Lender or its affiliates, on the one hand, and the Debtors or their affiliates, on the other hand arising out of or relating to the Existing Credit Facility, including any equitable subordination claims or defenses, with respect to or relating to the Prepetition Obligations or the Existing Credit Facility, the Debtors' attempts to restructure the Prepetition Obligations, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Existing Lender; and (ii) waive any and all defenses (including, without limitation, offsets, recoupments, and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and non-avoidability of the Prepetition Obligations and the Prepetition Liens.

## TERMINATION; REMEDIES; MODIFICATION OF AUTOMATIC STAY

15.    Termination.  The DIP Facility shall mature, and all unpaid principal, interest, fees, costs, expenses, and other DIP Loan Obligations shall be immediately due and payable, on the earliest to occur of (a) July 15, 2017 (the "Outside Date"), (b) 35 days after the Petition Date if the Final Order has not been entered by that date, (c) the closing date of any sale of substantially all of the assets of the Debtors' estates, (d) acceleration of the DIP Loan Obligations due to the occurrence of an Event of Default (subject to any right to cure, if such Event of Default provides for a cure and is capable of cure), (e) the appointment of a chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases, (f) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (g) the dismissal of any of the Chapter 11 Cases, (h) the effective date of any plan of reorganization in any of the Chapter 11 Cases that has been confirmed by an order of the Court, and (i) repayment in full of the DIP Facility and the termination of the commitments thereunder.  The date on which the earliest of clauses (a) through (i) occurs is referred to as the "Termination Date."  On the Termination Date, the DIP Facility shall be deemed terminated and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility, the Interim Order, any Final Order, or any DIP Loan Documents, other than in respect of the Carve-Out, if necessary.  All unpaid principal, interest, fees, costs, and expenses under the DIP Facility shall be due and payable in full on the Termination Date.  Any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several

34

obligations of the Obligors under the DIP Facility, the Interim Order, any Final Order, or the DIP Loan Documents.

16.    Remedies and Stay Modification.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified without the need for further Court order to permit the Secured Parties, as applicable, immediately upon the occurrence of an Event of Default, and without any interference from the Debtors or any other party interest, to permit (i) either of the Secured Parties to immediately terminate the use of any Cash Collateral (including the proceeds of any advances that are deposited in the DIP Facility Funding Account (as defined below) pursuant to the DIP Term Sheet) by giving written notice of such termination to the Debtors or other representative of the Debtors' estates and to counsel to Amgen, and (ii) the DIP Lender to terminate the DIP Facility as to any further advances and all commitments thereunder.

(b)    Subject to paragraph 16(d) below, on the fifth (5th) business day following the delivery by the Secured Parties of written notice (which shall be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee, counsel to Amgen, and counsel to the U.S. Trustee, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed, and are hereby, vacated and modified to permit the Secured Parties to exercise all rights and remedies provided for in the DIP Loan Documents, this Interim Order, the Existing Loan Documents, or under other applicable bankruptcy and nonbankruptcy law including, without limitation, the right to (i) terminate the commitments under the DIP Loan Documents (if not previously terminated); (ii) declare all DIP

35

Loan Obligations immediately due and payable (if not already due and payable); (iii) take any actions reasonably calculated to preserve or safeguard the DIP Collateral and/or the Prepetition Collateral and/or to prepare the DIP Collateral and/or the Prepetition Collateral for sale; (iv) foreclose or otherwise enforce the DIP Liens, the Prepetition Liens and the Replacement Liens on any or all of the DIP Collateral and/or the Prepetition Collateral; and (v) exercise any other default-related rights and remedies under the DIP Loan Documents or the Orders or applicable law.

(c)    Immediately upon the occurrence of an ongoing and uncured Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order, the DIP Lender may charge interest at the default rate set forth in the DIP Term Sheet, whether or not any Remedies Notice Period has commenced or expired.

(d)    Prior to the expiration of any Remedies Notice Period pursuant to paragraph 16(b) above, the Debtors, the Creditors' Committee, if any, Amgen, and/or the U.S. Trustee may seek an order from this Court to reimpose or continue, following the expiration of any Remedies Notice Period, the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and shall have the burden of proof at any hearing on any such request.

(e)    If either the DIP Lender or the Existing Lender is entitled, and has elected in accordance with the provisions hereof, to enforce its respective liens and security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors (or any trustee appointed under chapter 11 or chapter 7) shall cooperate with the

36

Secured Parties (as applicable) in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtors' premises to representatives or agents of the Secured Parties (including any collateral liquidator or consultant), (ii) providing the Secured Parties and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the Secured Parties or their respective representatives, (iii) performing all other obligations set forth in the DIP Loan Documents and the Existing Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the Secured Parties' enforcement of rights.

(f)     Following the expiration of the Remedies Notice Period, unless otherwise ordered by the Court, the DIP Lender and the Existing Lender may at all times exercise collection rights and sweep cash as provided in the Existing Loan Documents, the DIP Loan Documents, or applicable law.  The DIP Lender may immediately apply any funds then on deposit in the post-petition debtor-in-possession deposit account utilized for advances by the DIP Lender (the "DIP Facility Funding Account").  The DIP Facility Funding Account shall be deemed, pursuant to this Order, duly perfected and subject to the "control" of the DIP Lender (as that term is defined under the Uniform Commercial Code as enacted in the state of the depositary bank's jurisdiction).

(g)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order, including matters

relating to the application, reimposition, or continuation of the automatic stay of section 362(a)

of the Bankruptcy Code or other injunctive relief requested.

## MISCELLANEOUS

17.    <u>Limitation on Section 506(c) Claims</u>.  Effective upon entry of the Final Order, no

costs or expenses of administration that have been or may be incurred in these Chapter 11 Cases

or any Successor Cases at any time shall be surcharged against, and no person may seek to

surcharge any costs or expenses of administration against, the Secured Parties or any of their

respective claims, the Carve-Out, the DIP Collateral, or the Prepetition Collateral, pursuant to

sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as

applicable, of the Secured Parties.  No action, inaction, or acquiescence by the Secured Parties

shall be deemed to be, or shall be considered evidence of, any alleged consent to a surcharge

against the Secured Parties, any of their respective claims, the Carve-Out, the DIP Collateral, or

the Prepetition Collateral.

18.    <u>No Marshaling</u>.  Effective upon entry of the Final Order, the Secured Parties shall

not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect

to any of the DIP Collateral or the Prepetition Collateral, or otherwise.  Without limiting the

generality of the immediately preceding sentence, no party shall be entitled, directly or

indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise)

to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default.

19.    <u>Equities-of-the-Case Waiver</u>.  The Secured Parties shall each be entitled to all of

the rights and benefits of section 552(b) of the Bankruptcy Code.  Effective upon entry of the

38

Final Order, no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Secured Parties with respect to any proceeds, product, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, or otherwise.

20.    <u>No Internal Conflicts</u>.    Nothing in this Interim Order shall be construed to effectuate a waiver of (i) a surcharge claim under section 506(c) of the Bankruptcy Code, or (ii) an "equities of the case" claim under section 552(b) of the Bankruptcy Code, each of which is reserved until entry of a Final Order pursuant to paragraphs 17 and 19 of this Interim Order.

21.    <u>Additional Perfection Measures</u>.

The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order and shall have, and be entitled to, the priorities as provided herein.  None of the Debtors or the Secured Parties shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers, or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien, or similar instruments in any domestic or foreign jurisdiction (including, trademark, copyright, trade name, or patent assignment filings with the United States Patent and Trademark Office, United States Copyright Office, or any similar agency with respect to intellectual property, or filings with any other federal, state, local, or foreign agencies or authorities), or obtain consents from any licensor or similarly situated party in interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens or to establish the priorities as provided herein.

(a)     If the Secured Parties, in their sole and absolute discretion, choose to take any action to obtain consents from any landlord, licensor, or other party in interest, to file mortgages, financing statements, notices of lien, or similar instruments, or to otherwise record or perfect such security interests and liens, such Secured Parties are hereby authorized, but not directed to, take such action or to request that Debtors take such action on their behalf (and Debtors are hereby authorized and directed to take such action) and:

(i)     any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)     no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted hereunder.

(b)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien, or similar instruments, the Secured Parties may, in their sole and absolute discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of collateral, and such filing by the Secured Parties shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien, or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

(c)     <u>Application of Collateral Proceeds</u>.  After an Event of Default and the expiration of the Remedies Notice Period, unless otherwise ordered by the Court, the Debtors are hereby authorized and directed to remit to the Secured Parties one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, the Replacement Liens, and the Prepetition

Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the Secured Parties to retain and apply all collections, remittances, and proceeds of the DIP Collateral, the Replacement Liens, and the Prepetition Collateral, except to the extent otherwise provided herein (A) first, to the DIP Lender to satisfy or reduce the DIP Loan Obligations until indefeasibly satisfied in full, (B) second, to the Existing Lender to satisfy or reduce the Adequate Protection Claim set forth in the Interim Order or Final Order (as applicable), and then (C) to the Existing Lender to satisfy or reduce the Prepetition Obligations in accordance with the priorities set forth in the Existing Loan Documents and, in each case, subject to the Amgen Intercreditor Agreement, until indefeasibly satisfied in full, (with (A) – (C) collectively known as the "Distribution Priorities"); provided, however, that to the extent the Carve-Out has not been previously funded, the payments set forth above shall be subject to the Carve-Out.  In furtherance of the foregoing, (a) all cash, securities, investment property, and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first-priority security interest in favor of the DIP Lender (or its designee) as well as to the Replacement Liens; (b) upon the occurrence and during the continuance of an Event of Default and the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to comply at all times with any instructions originated by the DIP Lender (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property, and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Lender (or its designee) by wire transfer (to such

41

account as the DIP Lender (or its designee) shall specify, or in such other manner as the DIP Lender (or its designee) shall direct) all such cash, securities, investment property, and other items held by it; and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor, and the Existing Lender prior to the Petition Date in connection with the Existing Loan Documents shall establish co-control in favor of the DIP Lender of any and all accounts subject thereto and any and all cash, securities, investment property, and other items of any Debtor deposited therein to secure the DIP Loan Obligations (provided that primary control rights shall vest in the DIP Lender), and all rights thereunder in favor of the Existing Lender shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Lender, until all of the DIP Loan Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Existing Lender.

22.     <u>Cash Management Systems</u>.   Subject to the Debtors' cash management order entered by the Court, the Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Documents, this Interim Order, and the order of this Court approving the maintenance of the Debtors' cash management system.

23.     <u>Delivery of Documentation.</u>   The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lender, counsel to the DIP Lender, the Existing Lender and counsel to the Existing Lender, and any financial advisors to the DIP Lender or the Existing Lender, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Lender or the Existing Lender or such parties' legal and financial

advisors pursuant to the DIP Loan Documents or (ii) reasonably requested by the DIP Lender or the Existing Lender (or their legal and financial advisors).

24.   <u>Access to Books and Records</u>.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records, and accounts in accordance with GAAP in which full, true, and correct entries shall be made of all dealings and transactions in relation to their business and activities; (b) cooperate, consult with, and provide to the DIP Lender or the Existing Lender all such information as required or allowed under the DIP Loan Documents, the provisions of this Interim Order, or that is afforded to the Creditors' Committee and/or the Creditors' Committee's respective legal or financial advisors; (c) permit, upon reasonable notice, representatives of the DIP Lender or the Existing Lender to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, and independent public accountants as often as may reasonably be desired; and (d) permit representatives of the DIP Lender or the Existing Lender to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition, and operations.

25.   <u>Lenders Not Responsible Persons</u>.  Subject to any applicable Challenge pursuant to paragraph 13 above, in (a) making the decision to make the DIP Loans or consenting to the use of Cash Collateral, (b) administering the DIP Loans, (c) extending other financial

accommodations to the Debtors under the DIP Loan Documents and this Interim Order, (d) making the decision to make the loans and financial accommodations under the Existing Loan Documents, (e) administering the loans and financial accommodations extended under the Existing Loan Documents; (f) extending other financial accommodations to the Debtors under the Existing Loan Documents, and (g) making the decision to collect the indebtedness and obligations of the Debtors, none of the Secured Parties shall solely by reason thereof be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq., as either may be amended from time to time, or any similar federal or state statute).

26.    <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, the Secured Parties, and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the Secured Parties, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

27.  <u>Binding Nature of Agreement</u>.  The DIP Loan Documents to which the Debtors are a party shall constitute legal, valid, and binding joint and several obligations of the Debtors party thereto, enforceable in accordance with its terms.  The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lender by the Debtors.  Unless otherwise consented to in writing by the Secured Parties in the sole and absolute discretion, the rights, remedies, powers, privileges, liens, and priorities of the Secured Parties provided for in this Interim Order, the DIP Loan Documents, or otherwise shall not be modified, altered, or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases, or in any subsequent case under the Bankruptcy Code.

28.  <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rule 4001(b) and (c), granting the DIP Lender all protections and benefits afforded by section 364(e) of the Bankruptcy Code.  Any financial accommodations made to the Debtors by the Secured Parties pursuant to this Interim Order and the DIP Loan Documents shall be deemed to have been made by the Secured Parties in good faith, as such term is used in section 364(e) of the Bankruptcy Code.

29.  <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Secured Parties may have to bring or be heard on any matter brought before this Court.

30.    <u>Sale/Conversion/Dismissal</u>.

(a)    The Debtors and the DIP Lender have agreed that it shall be an additional Event of Default under the DIP Term Sheet if the Debtors shall seek or support entry of an order that provides for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the DIP Collateral unless, in connection and concurrently with any such event, (i) the proceeds of such sale are or will be sufficient to indefeasibly pay in full in cash all DIP Loan Obligations and the Adequate Protection Claim, and such DIP Loan Obligations and the Adequate Protection Claim are indefeasibly paid in full in cash and the commitments under the DIP Loan Documents and this Interim Order are terminated in accordance therewith on the closing date of such Sale, or (ii) the DIP Lender and Existing Lender consent to such sale in writing in their sole and absolute discretion.  For the avoidance of doubt, the DIP Lender and the Existing Lender each retains the right to file an objection to any proposed sale on any basis.

(b)    The Debtors and the DIP Lender have agreed that it shall be an additional Event of Default under the DIP Term Sheet if the Debtors shall seek or support the entry of any order dismissing these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code, or appointing a chapter 11 trustee or an examiner with expanded powers, unless and until (i) the DIP Loan Obligations are indefeasibly paid in full in cash and the commitments under the DIP Loan Documents and the Existing Loan Documents are terminated in accordance therewith, or (ii) the DIP Lender and the Existing Lender expressly consent in writing to such relief in their sole and absolute discretion.  If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, this

Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP

Liens, the DIP Superpriority Claim and the Prepetition Adequate Protection Rights.

31.     <u>Limits on Liability</u>.   Nothing in this Interim Order or in any of the DIP Loan

Documents or any other documents related to this transaction shall in any way be construed or

interpreted to impose or allow the imposition upon the Secured Parties of any liability for any

claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates

in the operation of their businesses or in connection with their restructuring efforts.

32.     <u>Priority of Terms</u>.   To the extent of any conflict between or among (a) the express

terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this

Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim

Order, on the other hand, the terms and provisions of this Interim Order shall govern.

33.     <u>No Modification of Amgen Agreements.</u>   Notwithstanding any other provisions

of the DIP Loan Documents and this Interim Order, nothing in this Interim Order or the DIP

Loan Documents shall modify, alter or impair the parties' respective rights under the Amgen

Intercreditor Agreement or the Letter Agreement dated February 22, 2016 regarding Non-

Disturbance of License Agreements ("Letter Agreement") and all such rights under such

agreements are expressly reserved and preserved. Nothing in this Interim Order shall affect,

impair or otherwise prejudice any parties' rights under section 365(n) of the Bankruptcy Code.

34.     <u>No Third-Party Beneficiary</u>.   Except as explicitly set forth herein, no rights are

created hereunder for the benefit of any third party, any creditor, or any direct, indirect, or

incidental beneficiary.

35.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim, and the Adequate Protection Claim shall continue in these Chapter 11 Cases, in any such Successor Cases, or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, the Replacement Liens, the DIP Superpriority Claim, and the Adequate Protection Claim shall maintain their priorities as provided in this Interim Order, the Final Order, and the DIP Loan Documents, and shall not be modified, altered, or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until all DIP Loan Obligations and the Prepetition Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Loan Documents are terminated in accordance therewith.

36.    Notwithstanding anything to the contrary, the Debtors shall not make any distribution of DIP Collateral sale proceeds to the Existing Lender on account of the Prepetition Obligations until entry of a Final Order unless there is an Event of Default prior to entry of the Final Order, in which case such distribution shall be governed by paragraph 20(c) above and the other provisions of this Interim Order (a "<u>Pre-Final Order Distribution</u>").  In the event that there

48

is a Pre-Final Order Distribution, any such distributions shall be held by the Existing Lender until the expiration of the Challenge Period Termination Date, upon which time the Existing Lender is authorized to apply such funds in accordance with this Interim Order or, if a timely Challenge is made, pursuant to a final order resolving such Challenge.

37.     <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c) and the local rules of this Court and, under the circumstances, was adequate and sufficient.  No further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) the Securities and Exchange Commission; (e) the Debtors' 20 largest unsecured creditors on a consolidated basis; (f) counsel to the Existing Lender and the DIP Lender; (g) counsel for Amgen; and (h) all other known parties asserting a lien against any of the Debtors' assets. The Court shall conduct a Final Hearing on the Motion commencing on May 4, 2017, at 2:00 p.m. (Eastern).

38.   <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

39.   <u>Proofs of Claim</u>.  The Existing Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Existing Lender upon approval of this Interim Order, and the Existing Lender shall be treated under section 502(a) of the Bankruptcy Code as if it had filed a proof of claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Existing Lender is hereby authorized and entitled, in its sole discretion, but not required, to file a proof of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

40.   <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

Dated: Wilmington, Delaware
       April __, 2017

 

 

                                         _____
                                         Honorable Laurie Selber Silverstein
                                         United States Bankruptcy Judge

# EXHIBIT A

(DIP TERM SHEET)

## UNILIFE CORPORATION

## PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION TERM CREDIT FACILITY

## TERM SHEET

### Dated as of April 11, 2017

*This term sheet (the "Term Sheet") and the Orders (as defined below) authorizing the Debtors to incur credit pursuant to this Term Sheet reflect the terms of the proposed debtor-in-possession financing (the "DIP Facility") and related accommodations.  The DIP Lender's commitment to provide the DIP Facility is subject to (a) entry and effectiveness of the Orders, (b) the conditions set forth herein and in the Orders and (c) at DIP Lender's (as defined below) option, delivery of final documentation satisfactory to DIP Lender ("Definitive Documentation").*

## TERMS OF DIP FACILITY

In the event that Unilife Corporation and certain of its direct and indirect subsidiaries determine to file a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") for the purpose of, among other objectives, effectuating a sale of all or substantially all of their assets (the "Sale"), the following describes the terms of a potential DIP Facility to be used to fund working capital during the pendency of the Chapter 11 cases (the "Chapter 11 Cases") under title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The terms and conditions for the potential extension of credit described in this Term Sheet are dependent upon, among other things, authorization and approval by the Bankruptcy Court.  The terms and conditions with respect to such commitments are mutually dependent on each other, and DIP Lender shall not be obligated to extend credit unless, among other conditions, agreement with the Obligors (as defined below) and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.

| | |
|---|---|
| **Borrower:** | Unilife Medical Solutions, Inc. (the "Company"), Unilife Corporation, ("Holdings"), and Cross Farm LLC ("Cross Farm") as debtors and debtors-in-possession (collectively, the "Borrower"). |
| **Debtors:** | The Company, Holdings and Cross Farm (the "Debtors"), each in their respective capacities as a debtor and debtor-in-possession in jointly administered Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court. |
| **Guarantors:** | All obligations under the DIP Facility, the Orders and the other DIP Loan Documents (defined below) shall be deemed unconditionally guaranteed jointly and severally by each other direct and indirect subsidiary of Holdings (such other subsidiaries and the Debtors, collectively, the "Obligors"). |
| **DIP Lender:** | ROS Acquisition Offshore LP, or its designated affiliate (the "DIP Lender"), would, subject to the satisfaction of all conditions set forth herein, in any Definitive Documentation, and in the Orders, provide commitments for 100% of the DIP Facility. |
| **Existing Secured Indebtedness:** | That certain *Credit Agreement* dated as of March 12, 2014 (as it has been and may be amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date (as defined below), the "Existing Credit |

Facility") by and between the Company, as borrower, and ROS Acquisition Offshore LP, as lender (in its capacity as such, the "Existing Lender"). Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meaning set forth in the Existing Credit Facility or, if not defined therein, the meaning set forth in the Uniform Commercial Code as enacted in the State of New York.

**Interim Order:**

An order of the Bankruptcy Court shall have been entered approving the DIP Facility, and authorizing the Debtors to incur the Interim Order Date Term Loan (as defined below), which order shall be subject to the written approval as to form and content by DIP Lender in its sole and absolute discretion (the "Interim Order").

**Final Order:**

A final order of the Bankruptcy Court approving the DIP Facility, which order shall be subject to the written approval as to form and content by DIP Lender in its sole and absolute discretion (the "Final Order," and together with the Interim Order, the "Orders").

**DIP Facility:**

- A senior secured priming superpriority debtor-in-possession credit facility in a maximum principal amount of $7.5 million (the "Total Commitment") that will consist of:

  (i) A term loan commitment in a maximum principal amount of $1 million (the "Interim Order Term Loan Commitment") shall be available upon entry of the Interim Order (the date of such entry, the "Interim Order Date"). On, or within two (2) business days of the Interim Order Date, DIP Lender will make a single extension of credit (all extensions of credit under the DIP Facility are referred to herein as an "Advance") to the Borrower in the amount of the Interim Order Term Loan Commitment (such Advance, the "Interim Order Date Term Loan").

  (ii) A term loan commitment in a maximum principal amount of $ 6.5 million (the "Final Order Term Loan Commitment") shall be available upon entry of the Final Order (the date of such entry, the "Final Order Date"), in three Advances to the Borrower, with the first Advance on the date that is three (3) business days after entry of the Final Order and the second and third Advances on June 2, 2017 and June 30, 2017, respectively, consistent with the Approved Budget (such Advances, the "Final Order Date Term Loan").

- In order to request an Advance under the Final Order Term Loan Commitment, Borrower shall provide DIP Lender with a Borrowing Request (as defined below) at least three (3) Business Days in advance of the requested funding date. The making of such Advance (including the timing thereof and the amount so advanced) shall be subject to DIP Lender's sole, reasonable determination that the conditions to borrowing hereunder have been satisfied. Each such Advance shall be in a minimum amount of $1,000,000 (unless the Advance represents the balance of the Final Order Term Loan Commitment), and shall not exceed the amount of the total disbursements projected for the applicable period under the Approved Budget.

- All Advances shall be subject to the terms and conditions set forth herein,

2

in any Definitive Documentation, and in the Orders, and shall be in compliance with the Approved Budget (as defined below). The Borrowers may prepay the Advances in whole or in part at any time, without penalty. Once an Advance (or any portion of any Advance) has been repaid, it may not be reborrowed. The Advances may, at the option of DIP Lender, be evidenced by a promissory note in form and substance satisfactory to DIP Lender in its sole and absolute discretion (each, a "Note") and upon the request of DIP Lender, Borrower shall execute and deliver a Note(s) to DIP Lender. Each Advance shall be made by wire transfer of immediately available funds to a post-petition debtor-in-possession deposit account of Company which shall be deemed, pursuant to each of the Orders, subject to the "control" of the DIP Lender as that term is defined under the Uniform Commercial Code as enacted in the state of the depositary bank's jurisdiction.

- The Approved Budget shall be a cash flow budget and shall be in form and substance consistent with the budget attached hereto as **Exhibit 1**, with adjustments thereto reflecting differences in the timing of receipts and disbursements resulting from the actual commencement date of the Chapter 11 Cases (the "Petition Date") and the date such disbursements are approved by the Court (if approval is necessary), or such other adjustments as may otherwise be approved by DIP Lender in writing in its sole and absolute discretion.

- This Term Sheet and all instruments, agreements and documents (including any Definitive Documents) that may be executed or delivered at any time in connection with the DIP Facility shall be referred to collectively as the "DIP Loan Documents."

- The Debtors shall use a cash management system that is the same as or substantially similar to its prepetition cash management system. Any material changes from such prepetition cash management system must be acceptable to, and approved in writing by, the DIP Lender in its sole and absolute discretion.

- The date on which the Interim Order Date Term Loan is funded is referred to as the "Closing Date."

**Use of Proceeds:**   The Advances will be used solely for (a) working capital and general corporate purposes of the Debtors in accordance with the Approved Budget, (b) Bankruptcy Court approved professional fees and other administrative expenses arising in the Chapter 11 Cases in accordance with the Approved Budget, (c) costs related to the Sale in accordance with the Approved Budget, and (d) interest and fees (including professional fees) due under the DIP Loan Documents and expenses incurred by the DIP Lender as provided by this Term Sheet, the DIP Loan Documents, or the Orders (in each case under this subsection (d), whether or not such amounts are reflected in the Approved Budget).

The Debtors' use of all cash (whether or not from Advances) shall be subject to a weekly budget for the 13-week period commencing on the Petition Date and ending on the Outside Date (defined below), in form and substance acceptable to, and approved in writing by, the DIP Lender in its sole and

3

absolute discretion (the "Approved Budget").

By not later than the fourth business day after the end of the week following the Petition Date, Debtors shall deliver to the DIP Lender and Amgen a variance report (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget. Thereafter, Debtors shall deliver to the DIP Lender and Amgen, by not later than the fourth business day after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four (4) week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one-, two- or three-week period, as applicable).

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis, (x) up to 10% for cash disbursements measured weekly on a line-item basis, (y) up to 20% for cash receipts measured every three weeks on a line-item basis, or (z) up to 10% in the aggregate for all cash disbursements (each, a "Permitted Variance").

None of the Advances and no Cash Collateral (defined below) shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the DIP Lender (in its capacity as such).

None of the Advances and no Cash Collateral shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, contested matters or other litigation against the Existing Lender (in its capacity as such), except up to the amount of $25,000 for an investigation (including any related discovery proceedings) by a specified party in interest (other than the Debtors) in connection with the validity and perfection of the liens granted under the Existing Credit Facility, as set forth in the Orders.

| | |
|---|---|
| **Security and Superpriority:** | The DIP Facility and all other obligations of the Debtors to the DIP Lender under or in connection with this Term Sheet, the DIP Loan Documents, or the Orders (collectively, the "DIP Obligations"), shall be: |

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases with priority over any and all administrative expenses, whether heretofore or hereafter incurred (including after any conversion of any of the Chapter 11 Cases to a case under chapter 7), of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and, subject to entry of the Final Order, including the proceeds of Avoidance Actions (as defined below) (but in all cases subject to the Carve-Out);

(ii)    pursuant to section 364(c)(2), secured by a perfected first-priority lien on the DIP Collateral (as defined below) to the extent that such collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second-priority lien on the DIP Collateral to the extent that such collateral is either (x) subject to a valid, perfected and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Credit Facility) in existence as of the Petition Date, (y) subject to a valid and non-avoidable first-priority lien in favor of third parties not affiliated with the Debtors (other than a first-priority lien under the Existing Credit Facility) in existence as of the Petition Date that is perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code, or (z) the Amgen Collateral, as defined, and to the extent provided in, the Amgen Intercreditor Agreement (as defined below); and

(iv)    pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first-priority, priming and senior security interest and lien granted to the DIP Lender (the "Priming DIP Liens," and together with the liens described in clauses (ii) and (iii) above, the "DIP Liens") in and on all the DIP Collateral to the extent that such collateral is subject to a first-priority lien under the Existing Credit Facility in existence as of the Petition Date (but in all cases subject to the Carve-Out). All existing liens, rights and interests granted to or for the benefit of the Existing Lender, and all liens *pari passu* with, or subordinate thereto, in existence as of the Petition Date, shall be primed and made subject to and subordinate to the Priming DIP Liens (but in all cases subject to the Carve-Out). For the sake of clarity, no security interests or liens granted hereunder shall (a) prime or be *pari passu* with Amgen's security interests and liens on the Amgen Collateral or (b) affect Amgen's rights under § 365(n) of the Bankruptcy Code.

The DIP Liens shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to (x) valid and non-avoidable first-priority liens in existence as of the Petition Date, including Amgen's liens in the Amgen Collateral, described in clause (iii) above, (y) permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its sole and absolute discretion and (z) valid and non-avoidable statutory liens imposed by applicable non-bankruptcy law (collectively, the "Permitted Liens").

All DIP Liens, and all Liens authorized and granted as adequate protection as described below and approved by the Bankruptcy Court, shall be deemed effective and perfected for all purposes pursuant to the Orders as of the Petition Date, and no further filing (including the filing of any UCC financing statement, any filing in the U.S. Patent and Trademark Office, any filing in the U.S. Copyright Office, or any filing in any other U.S. or foreign office or registry), recordation, possession, notice or act will be required to effect such perfection.

The term "Carve-Out" means, collectively: (i) unpaid fees and expenses required to be paid by the Debtors to the Clerk of the Bankruptcy Court and

5

to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) the amounts approved by the Court to be paid to current employees under the Debtors' Key Employee Retention Plan ("KERP") and Key Employee Incentive Plan ("KEIP") provided that DIP Lender shall have approved in writing, in its sole and absolute discretion, the form and content of the KERP and KEIP plans, including without limitation the conditions for, and timing of, any payments thereunder; (iv) to the extent allowed at any time and only up to the cumulative amounts for each such professional (including the noticing agent) set forth in the Approved Budget (and only if the retention of such professional (including the noticing agent) has been approved pursuant to a final order of the Bankruptcy Court), accrued and unpaid (net of any pre-petition retainers) reasonable fees, disbursements, costs, and expenses incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below) by any professionals retained by the Debtors or any official committee of unsecured creditors (the "Committee"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (collectively, the "Professional Fees"); and (v) after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, Professional Fees incurred after such date in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (v) being the "Post-Carve Out Trigger Notice Cap").

For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender (which delivery shall be made via electronic mail and overnight delivery) to the Debtors and their counsel, the United States Trustee, counsel to Amgen, and lead counsel to any Committee, which notice may only be delivered following the occurrence and during the continuance of an Event of Default (as defined below), and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

For the avoidance of doubt, to the extent that Advances are made under the DIP Facility on account of Professional Fees set forth in the Approved Budget, such Advances shall be deemed to correspondingly reduce the Carve-Out, whether or not such funds are disbursed to or for the benefit of such professionals. The Debtors and the DIP Lender shall agree on mutually satisfactory arrangements to reserve Advances made on account of the Carve-Out for Professional Fees pending approval of the Bankruptcy Court to disburse such amounts to the beneficiaries of the Carve-Out.

For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all claims and liens, including DIP Liens, as well as any adequate protection liens and claims described herein, other than Permitted Liens.

The Carve-Out does not include any Permitted Variance.

**Termination Date:**   The DIP Facility shall mature, and all unpaid principal, interest, fees, costs, and expenses shall be immediately due and payable, on the earliest to occur of (a) July 15, 2017 (the "Outside Date"), (b) 35 days after the Petition Date if the Final Order has not been entered by that date, (c) the closing date of the

6

Sale, (d) acceleration of the DIP Obligations due to the occurrence of an Event of Default (subject to any right to cure, if such Event of Default provides for a cure period and is capable of cure), (e) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases, (f) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (g) the dismissal of any of the Chapter 11 Cases, (h) the effective date of any Debtor's plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, and (i) repayment in full of the DIP Facility and the termination of the commitments thereunder. The date on which the earliest of clauses (a) through (i) occurs is referred to as the "Termination Date."

On the Termination Date, the DIP Facility shall be deemed terminated and the DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility, the Orders or any DIP Loan Documents, other than to fund any then outstanding Carve-Out. All unpaid principal, interest, fees, costs and expenses under the DIP Facility shall be due and payable in full on the Termination Date, whether at maturity, upon acceleration or otherwise.

Any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Obligors under the DIP Facility, the Orders or the DIP Loan Documents, other than after the payment in full in cash of all obligations under the DIP Facility, the Orders and the DIP Loan Documents on or before the effective date of a plan of reorganization and the termination of the Total Commitment.

| | |
|---|---|
| **Interest Rates:** | 10% per annum payable monthly in cash in arrears on each monthly anniversary of the Petition Date, computed based on a 360-day year. At all times (i) following Termination or (ii) while any Event of Default exists, unpaid principal, interest and other amounts shall bear interest at a rate per annum equal to 3% in excess of the foregoing interest rate. |
| **DIP Collateral:** | "DIP Collateral" means, collectively, all now owned or hereafter acquired assets and property of each Debtor and its respective chapter 11 estate, whether real or personal, tangible or intangible, existing or after-acquired, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, commercial tort claims, general intangibles, payment intangibles, all Intellectual Property (as that term is defined in the Existing Credit Facility), inventory, equipment, real estate, documents, instruments, deposit accounts, tax refunds, contract rights, chattel paper, investment property, letters of credit and letter-of-credit rights, money, fixtures, leasehold interests, avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (subject in the case of Avoidance Actions to entry of the Final Order), all intercompany claims, any and all proceeds arising from insurance policies, all claims and causes of action of the Debtors or their respective estates in the Chapter 11 Cases and any and all proceeds, profits, and products therefrom, supporting obligations therefor and accessions thereto, and the equity interests of each direct and indirect subsidiary of Holdings, which "DIP Collateral," for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of any Obligor that is secured pursuant to the Existing Credit Facility. |

7

| | |
|---|---|
| **Sale Proceeds:** | The Debtors will not seek or support entry of any order that provides for a Sale of the DIP Collateral other than the Amgen Collateral unless (i) the DIP Lender consents in writing to such Sale in its sole and absolute discretion, or (ii) the proceeds of the Sale are paid at closing of any such Sale to DIP Lender to satisfy the DIP Obligations in full. The DIP Lender and the Existing Lender shall have the right, respectively, to "credit bid" the DIP Obligations and the secured obligations under the Existing Credit Facility at the Sale. |
| **Lien Validation:** | The Debtors shall stipulate in each of the Orders that (i) the Existing Lender's claims under the Existing Credit Facility and the liens securing the Existing Credit Facility are valid, perfected, unavoidable and enforceable, encumber substantially all assets of the Debtors, and have first priority subject only to the Permitted Liens and (ii) the Debtors have fully and effectively released and otherwise do not have, own or possess any claims, offsets or any other type of defense or other cause of action against the Existing Lender which would impair, in any manner, the Existing Lender's claims and liens against the Debtors' assets, or the obligations of the Debtor under the Existing Credit Facility. |

The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Committee, except to the extent that both (i) an adversary proceeding is duly filed (x) by any party-in-interest prior to the expiration of the seventy-fifth (75th) day after the Petition Date or (y) by the Committee, if formed, prior to the sixtieth (60th) day after its formation ("Review Period"), in either case, expressly challenging the Existing Lender's claims or liens or otherwise asserting estate claims against the Existing Lender, and (ii) a final, non-appealable judgment is entered against the Existing Lender in such adversary proceeding upholding such challenge; provided, however, any party-in-interest that fails to file such an adversary proceeding within the applicable Review Period shall be forever barred from asserting any claims against the Existing Lender on behalf of the Debtors' estates, or challenging in any manner the Existing Lender's liens and claims against the Debtors.

In consideration of the furnishing of the DIP Facility and consent to use of cash collateral, the Debtors, subject to the rights of another party to bring an adversary proceeding during the Review Period in the manner described above, and upon entry of the Interim Order, hereby absolutely release and forever discharge the Existing Lender and, in their respective capacities as such, and its agents, affiliates, officers, directors, employees, attorneys, and other representatives from any and all known and unknown claims and causes of action of every kind and nature that the Debtors may hold against such released parties arising out of and related to the Existing Credit Facility.

| | |
|---|---|
| **Surcharge Waiver:** | Upon entry of the Final Order, the Debtors, as representatives of the estates and binding any subsequent chapter 11 trustee or chapter 7 trustee, hereby waive any right to surcharge the collateral granted under the Existing Credit Facility or as adequate protection or the DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law. |
| **Initial Conditions** | The making of the Interim Order Date Term Loan is subject to the satisfaction |

8

**Precedent:**                    of the following conditions precedent:

- at the DIP Lender's option, in its sole and absolute discretion, the execution and/or delivery (as applicable) of customary Definitive Documentation, opinions, closing certificates, lien and other searches, and other customary documents with respect to the DIP Facility, in each case, satisfactory to DIP Lender in its sole and absolute discretion;

- DIP Lender's satisfaction with, in its sole and absolute discretion, and the approval by the Bankruptcy Court of, the DIP Facility, any DIP Loan Documents and the transactions contemplated thereby (including actions and obligations by the Obligors), including, without limitation, the administrative expense superpriority of, and the Priming DIP Liens and other DIP Liens to be granted to secure, the DIP Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court satisfactory to DIP Lender in its sole and absolute discretion (including approval of DIP Lender's fees, costs and expenses as provided for in this Term Sheet));

- the entry of the Interim Order, in form and content satisfactory to DIP Lender in its sole and absolute discretion, within five (5) business days after the Petition Date;

- absence of (i) a default or Event of Default under the DIP Facility and (ii) any binding applicable law, regulation, ruling, judgment, order, injunction or other restraint that restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the Obligors, the DIP Facility (and the funding thereof) or the transactions contemplated by this Term Sheet or the DIP Loan Documents;

- all "first day" motions and proposed orders shall be reasonably acceptable to DIP Lender, as evidenced by its written approval;

- payment of (i) all costs and expenses required to be paid under the heading "Expenses" below on the Closing Date and (ii) all fees provided for hereunder or under the DIP Loan Documents or the Interim Order that are due and payable on the Closing Date;

- accuracy of those representations and warranties that, pursuant to the Orders or the DIP Loan Documents, are either (a) expressly incorporated under the DIP Facility by reference to the Existing Credit Facility, or (b) expressly set forth in the Orders or the DIP Loan Documents, in each case in all material respects (except to the extent such representation or warranty is already qualified by any time of materiality, in which case, in all respects).

**Conditions Precedent to Advances After the Closing Date:**    The obligation to fund Advances after the Closing Date shall be subject to the following conditions precedent:

- receipt by the DIP Lender of a borrowing request which shall (1) be irrevocable, (2) be in writing and signed by a senior officer of the Borrower, (3) be in compliance with the Approved Budget (subject to Permitted Variance), (4) include the amount requested to be

borrowed and the requested timing of such borrowing, and (5) state that no Event of Default has occurred or is reasonably likely to occur with the passage of time (a "<u>Borrowing Request</u>");

- absence of a default or Event of Default under the DIP Facility;

- accuracy of those representations and warranties that, pursuant to the Orders or the DIP Loan Documents, are either (a) expressly incorporated under the DIP Facility by reference to the Existing Credit Facility, or (b) expressly set forth in the Orders or the DIP Loan Documents, in each case in all material respects (except to the extent such representation or warranty is already qualified by any time of materiality, in which case, in all respects);

- since the Petition Date no material adverse change in the operations, business, properties or financial condition of the Obligors, taken as a whole (other than by virtue of the commencement of the Chapter 11 Cases and the events and conditions related and/or leading up to such commencement) shall have occurred;

- such Advance complies with the Approved Budget (within the Permitted Variance);

- availability under the Total Commitment; and

- entry and effectiveness of the Final Order, which shall not have been stayed.

**Bankruptcy Court Filings:** The Debtors shall provide DIP Lender with reasonable opportunity (at least two (2) business days prior to filing, unless the exigencies of the matter do not permit such opportunity) to review and comment on all significant first day and other motions and related papers filed in the Chapter 11 Cases before such papers are filed with the Bankruptcy Court.

**Representations and Warranties:** The Orders or the DIP Loan Documents shall specify those representations and warranties made by the Obligors under the Existing Credit Facility that shall apply to the DIP Facility, in each instance modified as necessary to reflect the commencement of the Chapter 11 Cases. The Orders or the DIP Loan Documents may also contain such other representations and warranties as DIP Lender shall require in connection with the DIP Facility.

**Documentation:** The Orders or the DIP Loan Documents shall specify those affirmative and negative covenants made by the Obligors under the Existing Credit Facility that shall apply to the DIP Facility, in each instance modified as necessary to reflect the commencement of the Chapter 11 Cases. In addition, Debtors agree with the DIP Lender that, until the Termination Date has occurred, the Debtors will, and will cause the Obligors to, perform or cause to be performed the obligations set forth below. No addendum, waiver, consent, modification, amendment or change of the terms of this Term Sheet shall be binding or effective unless agreed in writing by the DIP Lender and the Debtors, or as may otherwise be permitted under the Orders.

<u>**Information Covenants**</u>:

(a) <u>Budget Variance</u>. The Debtors shall deliver to DIP Lender the

FINAL (4-11-17) 65099/004

Approved Variance Report, together with a reasonably detailed written explanation of all material variances.

(b) <u>Chapter 11 Cases Filings</u>. The Debtors shall deliver to DIP Lender promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any Debtor or any other Obligor with the Bankruptcy Court in the Chapter 11 Cases, and any financial reports distributed by or on behalf of any Debtor or any other Obligor to any Committee appointed in the Chapter 11 Cases or such Committee's advisor.

### Affirmative Covenants:

(a) Comply with each Order.

(b) Provide reasonable access by the DIP Lender to information (including historical information) and personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities.

### Negative Covenants:

(a) Create or permit to exist any administrative expense, unsecured claim, or other superpriority claim or lien that is *pari passu* with or senior to the claims of the DIP Lender under the DIP Facility or the DIP Liens (other than Permitted Liens), or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out.

(b) Make or permit to be made any change, amendment or modification, or file any application or motion for any change, amendment or modification, to any of the Orders, without the prior written consent of the DIP Lender in its sole discretion.

(c) Create or permit to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any Permitted Liens.

(d) Modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted, in each case, as such was conducted on the Closing Date, or (ii) its organizational documents, except as required by the Bankruptcy Code.

(e) Assert any right of subrogation, indemnification, reimbursement, or contribution against any other Debtor until all borrowings and obligations under the DIP Facility are paid in full and the Total Commitment is terminated.

(f) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than (i) as contemplated under the heading "Adequate Protection" below or (ii) payments agreed in writing by DIP Lender in its sole and absolute discretion and authorized by the Bankruptcy Court.

**Events of Default:**    Each of the following shall constitute an event of default under the DIP Facility (each an "<u>Event of Default</u>"):

11

(a) failure to pay any interest, principal or fees when due under the DIP Facility;

(b) any representation or warranty is found to have been materially incorrect when made or deemed made;

(c) failure to comply with the Approved Budget subject to the Permitted Variance;

(d) breach of any other covenant, subject to customary notice and cure periods to be agreed;

(e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(f) dismissal of any of the Chapter 11 Cases that is without DIP Lender's written consent, in its sole discretion;

(g) the appointment of a Chapter 11 trustee or an examiner with expanded powers in any of the Chapter 11 Cases;

(h) the grant or existence of any superpriority administrative expense claim or any lien which is pari passu with or senior to those of the DIP Lender (other than the Carve-Out and the Permitted Liens);

(i) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in any material assets of any Obligor;

(j) any reversal, revocation or modification without the written consent of DIP Lender in its sole and absolute discretion of (i) the Interim Order, (ii) the Final Order or (iii) any other order of the Bankruptcy Court that could materially affect the DIP Facility in any manner adverse to the DIP Lender;

(k) failure to meet any of the Chapter 11 Milestones on or before the Specified Deadlines (each as defined in **Exhibit 2** to this Term Sheet); and

(l) the filing with the Bankruptcy Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases that has not been approved in writing by the DIP Lender in its sole and absolute discretion or that does not provide for indefeasible payment in full in cash to the DIP Lender of the DIP Facility and all other amounts outstanding under this Term Sheet, the DIP Loan Documents and the Orders on the effective date of such plan.

**Remedies:**    As set forth in the Interim Order and the Final Order, upon the occurrence of an Event of Default and following the giving of five business days' notice to the Borrower and counsel to Amgen during which period the Event of Default, if capable of cure, is not fully cured, unless otherwise ordered by the Bankruptcy Court, DIP Lender shall (a) have the right to declare the entire unpaid principal amount of any outstanding Advances under the DIP Facility, together with all accrued but unpaid interest and any unpaid fees and expenses, immediately due and payable, and (b) be deemed to have relief from the automatic stay after the passage of five days after notice is provided to the Borrower and counsel to Amgen of such Event of Default to foreclose

12

on all or any portion of the DIP Collateral, exercise collection rights as to accounts receivable, payment intangibles and other rights to payment and apply the proceeds thereof to the obligations arising under the DIP Facility, occupy premises to sell assets, or otherwise exercise remedies against the security for the DIP Facility as permitted by applicable non-bankruptcy law; *provided,* that DIP Lender shall have the right at any time to seek an order of the Bankruptcy Court to enforce the Orders or to enjoin any breach or threatened breach thereof; *provided further that,* any automatic stay otherwise applicable to the DIP Lender shall be deemed modified, without further notice, hearing or order of the Court, to permit the DIP Lender to immediately terminate the Debtors' use of any Cash Collateral and terminate the DIP Facility as to any further Advances.

**Expenses and Indemnity:**

The Debtors shall pay all of the documented costs and expenses of DIP Lender (upon presentation of a summary invoice redacted to protect for privileged and confidential matters) incurred in connection with the transactions contemplated by this Term Sheet, the DIP Loan Documents and the Orders, including the fees and expenses of counsel to, and other professionals and advisors retained by, the DIP Lender, as well as all expenses of the DIP Lender in connection with the administration, monitoring and enforcement of the Orders or the DIP Loan Documents, the enforcement of the Orders or the DIP Facility after an Event of Default or acceleration of the obligations under the DIP Facility, and the negotiation and documentation of any sale agreement, plan of reorganization and disclosure statement, and any other related agreements.[1]  To the extent the DIP Lender's costs and expenses exceed the amounts in the Approved Budget, such amounts shall be added to the Total Commitment under the DIP Facility and the payment of such additional costs and expenses shall not give rise to an Event of Default.

The Debtors shall indemnify and hold the DIP Lender and its respective officers, directors, employees and agents (including all of their professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Loan Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

---

[1]     Prior to the filing of the petitions for the Chapter 11 Cases, Company paid DIP Lender a work fee in the amount of $100,000 ("Work Fee"), on account of DIP Lender's efforts to negotiate and establish the DIP Facility contemplated by this Term Sheet.  The Work Fee shall be applied against DIP Lender's costs and expenses payable by the Debtors under this Term Sheet, provided that, the Work Fee shall be deemed earned in full upon receipt and shall not be refundable under any circumstances or otherwise subject to reduction by way of setoff or counterclaim.

13

| | |
|---|---|
| **Adequate Protection:** | Upon entry of the Interim Order, as adequate protection, and in consideration for the consent of the Existing Lender to (i) the use of Cash Collateral (as defined in the Interim Order) according to the Approved Budget, and (ii) the subordination of the liens granted under the Existing Credit Facility solely to the liens in the DIP Collateral in favor of the DIP Loan Obligations, the Existing Lender shall receive (a) replacement liens and adequate protection pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, in respect of the Existing Credit Agreement, which shall be junior only to (i) the claims and liens of the DIP Lenders as described under "Security" above, (ii) the claims and liens of Amgen in the Amgen Collateral, and (iii) payment of the Carve Out, and (b) a superpriority administrative expense claim against all Debtors pursuant to section 507(b) of the Bankruptcy Code junior only to the superpriority administrative expense claims under the DIP Facility and the Carve-Out, in each case to the extent of any diminution in value. |
| **Time of the Essence:** | Time is of the essence of all obligations, conditions, and other provisions of this Term Sheet, the DIP Loan Documents, and the Orders. |
| **Amgen Intercreditor Agreement:** | For purposes of this Term Sheet, the "<u>Amgen Intercreditor Agreement</u>" shall mean that certain *Intercreditor Agreement* and that certain letter agreement, each dated as of February 22, 2016, between Amgen Inc. and OrbiMed (as defined in such agreement). In the event of any inconsistency between the terms and conditions of this Term Sheet and the Amgen Intercreditor Agreement, the provisions of the Amgen Intercreditor Agreement shall govern and control. Nothing in this term sheet is intended to alter or impair the respective rights and obligations of the parties to the Amgen Intercreditor Agreement or any other agreement between Amgen and OrbiMed and/or DIP Lender. |

FINAL (4-11-17)  65099/004

APPROVED AND ACCEPTED:

BORROWER:

UNILIFE MEDICAL SOLUTIONS, INC.

By: _____
Its: _____

UNILIFE CORPORATION

By: _____
Its: _____

CROSS FARM LLC

By: _____
Its: _____

DIP LENDER:

ROS ACQUISITION OFFSHORE LP

By: _____
Its: _____

FINAL (4-11-17) 65099/004

**EXHIBIT 1**

**APPROVED BUDGET**

## Unilife Cash Forecast
Budget

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Closing |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Ended: | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | 30-Jun |
| **Incoming:** | | | | | | | | | | | | | |
| Total Incoming Cash | $ - | $ - | $ - | $ 69,127 | $ - | $ - | $ 125,000 | $ 64,127 | $ 125,000 | $ - | $ - | $ - | $ 508,254 |
| **Disbursements:** | | | | | | | | | | | | | |
| Materials | (50,000) | (30,000) | - | - | - | (30,000) | - | - | (30,000) | - | - | - | (140,000) |
| KOP Rent | - | - | - | (100,116) | - | - | - | (100,116) | - | - | - | - | (200,232) |
| KOP Utilities | - | - | - | (10,000) | - | - | - | - | (10,000) | - | - | - | (20,000) |
| Total KOP | - | - | - | (110,116) | - | - | - | (100,116) | (10,000) | - | - | - | (220,232) |
| Direct Energy - Electricty | - | - | - | - | (5,000) | - | - | - | - | (5,000) | - | - | (10,000) |
| Met Ed - Electricity | - | - | - | (15,643) | - | - | - | - | (15,600) | - | - | - | (31,200) |
| Columbia Gas - Natural Gas | - | - | - | - | (3,000) | - | - | - | - | (3,000) | - | - | (6,000) |
| Chubb - P&C Insurance | (17,750) | - | - | (17,750) | - | - | - | (17,750) | - | - | - | - | (53,250) |
| Air Gas - Compressed Air | - | - | (240) | - | - | - | - | - | - | - | - | - | (240) |
| Conestoga Township - Sewer | (2,500) | - | - | (2,500) | - | - | - | (2,500) | - | - | - | - | (7,500) |
| Johnson Controls - Maintenance | - | - | (2,400) | - | - | - | (1,200) | - | - | - | - | - | (3,600) |
| Orkin - Pest Control | - | - | (510) | - | - | - | (255) | - | - | - | - | - | (765) |
| Waste Mgmt - Small Trash Disposal | (850) | - | - | (850) | - | - | - | (850) | - | - | - | - | (2,550) |
| Republic - Large Trash Disposal | - | (400) | - | - | (400) | - | - | - | - | (400) | - | - | (1,200) |
| Thyssen - Elevator | (150) | - | - | (150) | - | - | - | (150) | - | - | - | - | (450) |
| Brickman - Lawn Care | (2,000) | - | - | (2,000) | - | - | - | (2,000) | - | - | - | - | (6,000) |
| Total York | (23,250) | (400) | (3,150) | (39,850) | (8,000) | (400) | (1,455) | (33,250) | (15,600) | (8,400) | - | - | (122,595) |
| ADP - Payroll | (10,000) | - | - | (9,500) | - | - | - | - | - | - | - | - | (28,500) |
| Censtar - T&E | (2,470) | - | - | (1,235) | - | - | - | - | - | - | - | - | (3,705) |
| Fidelity - 401K Processing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TASC - Flex Spending | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Blackline - Account Reconciliation | - | - | (690) | - | - | - | (345) | - | - | - | - | - | (1,035) |
| Guernsey - Office Supplies | - | - | (800) | - | - | - | (400) | - | - | - | - | - | (1,200) |
| Holt - Office Supplies | - | (600) | - | - | (300) | - | - | - | - | - | - | - | - |
| Merrill - Data Room | - | - | (9,000) | - | - | - | (4,500) | - | - | - | - | - | (13,500) |
| PNC Bank - P-Card | (75) | - | - | (75) | - | - | - | - | (75) | - | - | - | (225) |
| Shred-IT - Document Destruction | - | (310) | - | - | - | - | (310) | - | - | (310) | - | - | (930) |
| Master Control - Quality Software | (49,866) | - | - | - | - | - | - | - | - | - | - | - | (49,866) |
| Total Administration | (71,411) | (910) | (10,490) | (10,810) | - | (610) | (5,245) | - | (75) | (310) | - | - | (99,861) |
| AT&T - Cell Phones | (3,500) | - | - | (3,500) | - | - | - | (3,500) | - | - | - | - | (10,500) |
| Freudenburg IT - SAP Hosting | - | (16,600) | - | - | - | (8,300) | - | - | - | - | - | - | (24,900) |
| Niche - SAP Contractors | (5,800) | - | - | (5,500) | - | - | - | (5,500) | - | - | - | - | (16,800) |
| 8x8 - Corporate Phone Lines | (8,300) | - | - | (8,300) | - | - | - | (8,300) | - | - | - | - | (24,900) |
| Verizon - Cell Phones | (1,500) | - | - | (1,500) | - | - | - | - | (1,500) | - | - | - | (4,500) |
| Black Mesh - Website | (350) | - | - | (350) | - | - | - | (350) | - | - | - | - | (1,050) |
| Faction - IT Service | - | - | - | (1,000) | - | - | - | (1,000) | - | - | - | - | (2,000) |
| Iron Mountain - Data Storage | - | - | (600) | - | - | - | (600) | - | - | - | - | - | (1,200) |
| Level 3 - Internet | (12,600) | - | - | (12,600) | - | - | - | (12,600) | - | - | - | - | (37,800) |
| Toshiba - Copier | (1,200) | - | - | (1,200) | - | - | - | - | (1,200) | - | - | - | - |
| L-Com - IT Service | - | - | (200) | - | - | - | (300) | - | - | - | - | - | (500) |
| Vector Security - IT Security | - | - | - | - | - | - | (600) | - | - | - | - | - | (600) |
| Continental / CDW - Firewall | - | - | - | - | (2,000) | - | - | - | - | - | - | - | (2,000) |
| Design Point - CAD | - | - | - | - | (10,000) | - | - | - | - | - | - | - | (10,000) |
| Total IT | (32,950) | (16,600) | (1,000) | (33,950) | (21,000) | (8,300) | (1,100) | (27,750) | (6,200) | - | - | - | (148,850) |

Page 1 of 2

## Unilife Cash Forecast
Budget

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Closing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | 30-Jun |
| Crown O'Connor | - | - | - | (225,000) | - | - | - | (225,000) | - | - | - | (225,000) | (675,000) |
| SSG Capital Advisors | - | - | - | (30,000) | - | - | - | (30,000) | - | - | - | (60,000) | (60,000) |
| Company Financial Adviser | - | - | - | (20,000) | - | - | - | (20,000) | - | - | - | (20,000) | (60,000) |
| DIP Lender Counsel | - | - | - | (150,000) | - | - | - | (150,000) | - | - | - | (150,000) | (450,000) |
| Committee Professionals | - | - | - | (55,000) | - | - | - | (55,000) | - | - | - | (55,000) | (165,000) |
| Diane Morris | - | - | - | (83,333) | - | - | - | (83,333) | - | - | - | (83,333) | (249,999) |
| DLA (Australia) | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (30,000) | (50,000) |
| Ballard Spahr | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Senior Secured Lender Counsel | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Regulatory Counsel | - | - | - | (5,000) | - | - | - | (5,000) | - | - | - | (5,000) | (15,000) |
| Noticing Agent | - | - | - | (30,000) | - | - | - | (30,000) | - | - | - | (30,000) | (90,000) |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | (10,400) | (10,400) |
| **Total Professionals** | - | - | - | (628,333) | - | - | - | (628,333) | - | - | - | (1,228,733) | (2,485,399) |
| Payroll | - | - | (355,020) | - | (346,770) | - | (345,507) | - | (345,507) | - | (336,200) | - | (1,731,271) |
| Payroll Taxes | - | - | (27,159) | - | (26,526) | - | (26,438) | - | (26,438) | - | (25,874) | - | (132,442) |
| Benefits | - | - | (51,332) | - | (50,087) | - | (50,299) | - | (50,299) | - | (49,136) | - | (251,155) |
| KEIPs / KERPs | - | - | - | - | - | - | - | - | - | - | - | (2,390,081) | (2,390,081) |
| Accrued Payroll Liabilities | - | - | - | - | - | - | - | - | - | - | - | (404,278) | (404,278) |
| **Total Payroll** | - | - | (433,511) | - | (423,384) | - | (422,334) | - | (422,334) | - | (413,306) | (2,794,359) | (4,909,197) |
| Australia Opex / Wind-Down | - | - | - | - | - | - | - | (30,000) | - | - | - | (5,000) | (35,000) |
| Patent / Intellectual Property Related Costs | (283,333) | - | - | (283,333) | - | - | - | (283,333) | - | - | - | - | (850,000) |
| Interest Expense | - | - | - | - | (7,222) | - | - | - | - | (25,191) | - | (21,474) | (53,806) |
| Accrued Operating Liabilities | - | - | - | - | - | - | - | - | - | - | - | (27,050) | (27,050) |
| Buyer Accrued Opex Liabilities Reconciliation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HRA Reserve | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (115,000) |
| Utilities Deposit | - | - | - | (59,700) | - | - | - | - | - | - | - | - | (59,700) |
| NSAI Audit | - | - | (15,000) | - | - | - | - | - | - | - | - | - | (15,000) |
| Travel Expenses | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Expense Backlog | (25,000) | - | - | - | - | - | - | - | - | - | - | - | (25,000) |
| **Other Disbursements** | (317,917) | (9,583) | (24,583) | (362,617) | (16,806) | (9,583) | (9,583) | (332,917) | (9,583) | (32,778) | (9,583) | (73,113) | (1,209,646) |
| | | | | | | | | | | | | | |
| **Total Disbursements** | $ (495,928) | $ (57,493) | $ (472,724) | $ (1,184,676) | $ (469,190) | $ (48,093) | $ (439,717) | $ (1,112,366) | $ (493,792) | $ (41,489) | $ (422,889) | $ (4,096,174) | (9,334,939) |
| **Beginning Cash** | $ 1,664,064 | $ 2,168,536 | $ 2,111,043 | $ 1,638,309 | $ 522,760 | $ 1,553,571 | $ 1,504,677 | $ 1,189,960 | $ 1,141,722 | $ 772,930 | $ 856,442 | $ 433,583 | |
| **DIP Advances \*** | $ 1,000,000 | $ - | $ - | $ - | $ 1,500,000 | $ - | $ - | $ 1,000,000 | $ - | $ - | $ - | $ 3,662,621 | |
| **Change in Cash Balance** | $ 504,472 | $ (57,493) | $ (472,724) | $ (1,115,569) | $ 1,030,810 | $ (48,093) | $ (314,717) | $ (48,339) | $ (368,792) | $ 83,512 | $ (422,889) | $ (433,583) | |
| **Ending Cash** | $ 2,168,536 | $ 2,111,043 | $ 1,638,309 | $ 522,760 | $ 1,553,571 | $ 1,504,677 | $ 1,189,960 | $ 1,141,722 | $ 772,930 | $ 856,442 | $ 433,583 | $ - | |

\* June 30 DIP Advance on account of KEIP, KERP and the SSG success fee are subject to the requirements of the orders approving such fees and payments

## EXHIBIT 3

### CHAPTER 11 MILESTONES

The obligations of the DIP Lender to make the Advances under the DIP Facility and the Existing Lender's to consent to the use of Cash Collateral shall be subject to the Debtors' satisfying, or causing the satisfaction of, the milestones listed below (collectively, the "**Chapter 11 Milestones**") on or before the specified deadline (after taking into account any applicable cure period, the "**Specified Deadlines**"). The failure to satisfy any Chapter 11 Milestone by the applicable Specified Deadline (and the non-waiver of such non-satisfaction by the DIP Lender in writing in its sole and absolute discretion) shall be an Event of Default under the Term Sheet.

| | **Chapter 11 Milestone** | **Specified Deadline** |
|---|---|---|
| 1. | Commencement of the Chapter 11 Cases and filing with the Bankruptcy Court of the DIP Motion,[1] and such other first day papers as may be approved in writing or requested by the DIP Lender, all of which shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion | On or prior to 6:00 p.m. EDT on April 12, 2017 |
| 2. | Entry by the Bankruptcy Court of the Interim Order which shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion | By April 13, 2017 (or by such later date as the DIP Lender may agree in writing in its sole and absolute discretion) |
| 3. | Entry by the Bankruptcy Court of the Auction Procedures Order[2] which shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion | By May 15, 2017 (or by such later date as the DIP Lender may agree in writing in its sole and absolute discretion) |
| 4. | Entry by the Bankruptcy Court of the Final Order which shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion | By May 15, 2017 (or by such later date as the DIP Lender may agree in writing in its sole and absolute discretion) |
| 5. | Commencement of Auction,[3] in accordance with the Auction Procedures Order | On or prior to 10:00 a.m. EDT on June 9, 2017 (or by such later date as the DIP Lender may agree in writing in its sole and absolute discretion) |
| 6. | Entry by the Bankruptcy Court of an order, in form and substance acceptable to the DIP Lender, in its sole and absolute discretion, approving the Sale | By June 16, 2017 (or by such later date as the DIP Lender may agree in writing in its sole and absolute discretion) |

---

[1]  'DIP Motion" means a motion, in form and substance acceptable to the DIP Lender in its sole and absolute discretion, to be filed with the Bankruptcy Court, pursuant to which motion the Debtors shall seek entry of the Orders.

[2]  "**Auction Procedures Order**" means an order of the Bankruptcy Court authorizing and approving the procedures and the dates and deadlines for consummation of the Sale.

[3]  "**Auction**" means the determination of the prevailing bidder for the assets subject to the Sale.

# EXHIBIT B

## APPROVED BUDGET

# Unilife Cash Forecast
Budget

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Closing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | | | | | | | | | | | | | |
| Week Ended: | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | 30-Jun |
| **Incoming:** | | | | | | | | | | | | | |
| Total Incoming Cash | $    - | $    - | $    - | $  69,127 | $    - | $    - | $  128,000 | $  64,127 | $  128,000 | $  128,000 | $    - | $    - | $  508,254 |
| **Disbursements:** | | | | | | | | | | | | | |
| Materials | (50,000) | (30,000) | - | - | - | (30,000) | - | - | (30,000) | - | - | - | (140,000) |
| KOP Rent | - | - | - | (100,116) | - | - | - | (100,116) | - | - | - | - | (200,232) |
| KOP Utilities | - | - | - | (10,000) | - | - | - | - | (10,000) | - | - | - | (20,000) |
| **Total KOP** | - | - | - | (110,116) | - | - | - | (100,116) | (10,000) | - | - | - | (220,232) |
| Direct Energy - Electricity | - | - | - | - | (5,000) | - | - | - | - | (5,000) | - | - | (10,000) |
| Met Ed - Electricity | - | - | - | (15,600) | - | - | - | - | (15,600) | - | - | - | (31,200) |
| Columbia Gas - Natural Gas | - | - | - | - | (3,000) | - | - | - | - | (3,000) | - | - | (6,000) |
| Chubb - P&C Insurance | (17,750) | - | - | (17,750) | - | - | - | (17,750) | - | - | - | - | (53,250) |
| Air Gas - Compressed Air | - | - | (240) | - | - | - | - | - | - | - | - | - | (240) |
| Conewago Township - Sewer | (2,500) | - | - | (2,500) | - | - | - | (2,500) | - | - | - | - | (7,500) |
| Johnson Controls - Maintenance | - | - | (2,400) | - | - | - | (1,200) | - | - | - | - | - | (3,600) |
| Orkin - Pest Control | - | - | (510) | - | - | - | (255) | - | - | - | - | - | (765) |
| Waste Mgmt - Small Trash Disposal | (850) | - | - | (850) | - | - | - | (850) | - | - | - | - | (2,550) |
| Republic - Large Trash Disposal | - | (400) | - | - | - | (400) | - | - | - | (400) | - | - | (1,200) |
| Thyssen - Elevator | (150) | - | - | (150) | - | - | - | (100) | - | - | - | - | (450) |
| Brickman - Lawn Care | (2,000) | - | - | (2,000) | - | - | - | (2,000) | - | - | - | - | (6,000) |
| **Total York** | (23,350) | (400) | (3,150) | (38,880) | (8,000) | (400) | (1,455) | (23,250) | (15,600) | (8,400) | - | - | (122,785) |
| ADP - Payroll | (19,200) | - | - | (9,500) | - | - | - | - | - | - | - | - | (28,500) |
| Concur - T&E | (2,470) | - | - | (1,235) | - | - | - | - | - | - | - | - | (3,705) |
| Fidelity - 401(K) Processing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TASC - Flex Spending | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Blackline - Account Reconciliation | - | - | (690) | - | - | - | (345) | - | - | - | - | - | (1,035) |
| Guernsey - Office Supplies | - | - | (800) | - | - | - | (400) | - | - | - | - | - | (1,200) |
| Holt - Office Supplies | - | (600) | - | - | - | (300) | - | - | - | - | - | - | (900) |
| Merrill - Data Room | - | - | (4,000) | - | - | - | (4,500) | - | - | - | - | - | (13,500) |
| PNC Bank - P-Card | (75) | - | - | (75) | - | - | - | - | (75) | - | - | - | (225) |
| Shred-IT - Document Destruction | - | (310) | - | - | - | (310) | - | - | - | (310) | - | - | (930) |
| Master Control - Quality Software | (49,866) | - | - | - | - | - | - | - | - | - | - | - | (49,866) |
| **Total Administration** | (71,411) | (910) | (10,490) | (10,810) | - | (610) | (5,245) | - | (75) | (310) | - | - | (99,861) |
| AT&T - Cell Phones | (3,500) | - | - | (3,500) | - | - | - | - | (3,500) | - | - | - | (10,500) |
| Freudenberg IT - SAP Hosting | - | (16,600) | - | - | - | (8,300) | - | - | - | - | - | - | (24,900) |
| Niche - SAP Contractors | (5,500) | - | - | (5,500) | - | - | - | (5,500) | - | - | - | - | (16,500) |
| 8x8 - Corporate Phone Lines | (8,300) | - | - | (8,300) | - | - | - | (8,300) | - | - | - | - | (24,900) |
| Verizon - Cell Phones | (1,500) | - | - | (1,500) | - | - | - | - | (1,500) | - | - | - | (4,500) |
| Black Mesh - Website | (350) | - | - | (350) | - | - | - | (350) | - | - | - | - | (1,050) |
| Faction - IT Service | - | - | - | (1,000) | - | - | - | (1,000) | - | - | - | - | (2,000) |
| Iron Mountain - Data Storage | - | - | (800) | - | - | - | (400) | - | - | - | - | - | (1,200) |
| Level 3 - Internet | (12,950) | - | - | (12,950) | - | - | - | (12,950) | - | - | - | - | (35,850) |
| Toshiba - Copier | (1,200) | - | - | (1,200) | - | - | - | (1,200) | (1,200) | - | - | - | (1,200) |
| L - Com - IT Service | - | - | (200) | - | - | - | (100) | - | - | - | - | - | (300) |
| Vector Security - IT Security | - | - | - | - | - | - | (600) | - | - | - | - | - | (600) |
| Continental / CDW - Firewall | - | - | - | - | (2,000) | - | - | - | - | - | - | - | (2,000) |
| Design Point - CAD | - | - | - | - | (19,000) | - | - | - | - | - | - | - | (19,000) |
| **Total IT** | (32,950) | (16,600) | (1,000) | (33,950) | (21,000) | (8,300) | (1,100) | (27,750) | (6,200) | - | - | - | (148,850) |

## Unilife Cash Forecast
Budget

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Closing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 14-Apr | 21-Apr | 28-Apr | 5-May | 12-May | 19-May | 26-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun | 30-Jun |
| Green O'Connor | - | - | - | (225,000) | - | - | - | (225,000) | - | - | - | (225,000) | (675,000) |
| SSG Capital Advisors | - | - | - | (30,000) | - | - | - | (30,000) | - | - | - | (600,000) | (660,000) |
| Company Financial Adviser | - | - | - | (20,000) | - | - | - | (20,000) | - | - | - | (20,000) | (60,000) |
| DIP Lender Counsel | - | - | - | (150,000) | - | - | - | (150,000) | - | - | - | (150,000) | (450,000) |
| Committee Professionals | - | - | - | (55,000) | - | - | - | (55,000) | - | - | - | (55,000) | (165,000) |
| Duane Morris | - | - | - | (83,333) | - | - | - | (83,333) | - | - | - | (83,333) | (249,999) |
| DLA (Australia) | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (30,000) | (50,000) |
| Ballard Spahr | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Senior Secured Lender Counsel | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Regulatory Counsel | - | - | - | (5,000) | - | - | - | (5,000) | - | - | - | (5,000) | (15,000) |
| Noticing Agent | - | - | - | (30,000) | - | - | - | (30,000) | - | - | - | (30,000) | (90,000) |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | (10,400) | (10,400) |
| **Total Professionals** | **-** | **-** | **-** | **(628,333)** | **-** | **-** | **-** | **(628,333)** | **-** | **-** | **-** | **(1,228,733)** | **(2,485,399)** |
| Payroll | - | - | (355,020) | - | (346,770) | - | (345,547) | - | (345,547) | - | (338,269) | - | (1,731,271) |
| Payroll Taxes | - | - | (27,159) | - | (26,528) | - | (26,438) | - | (26,438) | - | (25,879) | - | (132,442) |
| Benefits | - | - | (51,332) | - | (50,087) | - | (50,249) | - | (51,299) | - | (49,138) | - | (251,155) |
| KEIPs / KERPs | - | - | - | - | - | - | - | - | - | - | - | (2,390,051) | (2,390,051) |
| Accrued Payroll Liabilities | - | - | - | - | - | - | - | - | - | - | - | (404,278) | (404,278) |
| **Total Payroll** | **-** | **-** | **(433,511)** | **-** | **(423,384)** | **-** | **(422,334)** | **-** | **(422,334)** | **-** | **(413,386)** | **(2,794,329)** | **(4,909,197)** |
| Australia Opex / Wind-Down | - | - | - | - | - | - | - | - | (30,000) | - | - | (5,000) | (35,000) |
| Patent / Intellectual Property Related Costs | (283,333) | - | - | (283,333) | - | - | - | (283,333) | - | - | - | - | (850,000) |
| Interest Expense | - | - | - | - | (7,222) | - | - | - | - | (23,394) | - | (21,479) | (51,896) |
| Accrued Operating Liabilities | - | - | - | - | - | - | - | - | - | - | - | (27,080) | (27,080) |
| Buyer Accrued Opex Liabilities Reconciliation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HRA Reserve | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (9,583) | (115,000) |
| Utilities Deposit | - | - | - | (59,700) | - | - | - | - | - | - | - | - | (59,700) |
| NSAI Audit | - | - | (15,000) | - | - | - | - | - | - | - | - | - | (15,000) |
| Travel Expenses | - | - | - | (10,000) | - | - | - | (10,000) | - | - | - | (10,000) | (30,000) |
| Expense Backlog | (25,000) | - | - | - | - | - | - | - | - | - | - | - | (25,000) |
| **Other Disbursements** | **(317,917)** | **(9,583)** | **(24,583)** | **(362,617)** | **(16,806)** | **(9,583)** | **(9,583)** | **(332,917)** | **(9,583)** | **(32,778)** | **(9,583)** | **(73,113)** | **(1,208,646)** |
| **Total Disbursements** | **$ (495,528)** | **$ (57,493)** | **$ (472,734)** | **$ (1,184,676)** | **$ (469,190)** | **$ (48,893)** | **$ (439,717)** | **$ (1,112,366)** | **$ (493,792)** | **$ (41,488)** | **$ (422,889)** | **$ (4,096,174)** | **$ (9,334,939)** |
| **Beginning Cash** | **$ 1,664,064** | **$ 2,168,536** | **$ 2,111,043** | **$ 1,638,309** | **$ 522,760** | **$ 1,553,571** | **$ 1,504,677** | **$ 1,189,960** | **$ 1,141,722** | **$ 772,930** | **$ 886,442** | **$ 433,553** | |
| **DIP Advances \*** | **$ 1,000,000** | **$ -** | **$ -** | **$ -** | **$ 1,500,000** | **$ -** | **$ -** | **$ 1,000,000** | **$ -** | **$ -** | **$ -** | **$ 3,662,621** | |
| **Change in Cash Balance** | **$ 504,472** | **$ (57,493)** | **$ (472,734)** | **$ (1,115,549)** | **$ 1,030,810** | **$ (48,893)** | **$ (314,717)** | **$ (48,239)** | **$ (368,792)** | **$ 83,512** | **$ (422,889)** | **$ (433,553)** | |
| **Ending Cash** | **$ 2,168,536** | **$ 2,111,043** | **$ 1,638,309** | **$ 522,760** | **$ 1,553,571** | **$ 1,504,677** | **$ 1,189,960** | **$ 1,141,722** | **$ 772,930** | **$ 886,442** | **$ 433,553** | **$ -** | |

\* June 30 DIP Advance on account of KEIP, KERP and the SSG success fee are subject to the requirements of the orders approving such fees and payments